WETMORE, Appellant, v. CROUCH.

Division One, June 14, 1899.

1   Pleading: CONTRACT: EXPRESS AND IMPLIED. If the contract relied on by plaintiff for a recovery is express, it must be so pleaded; if it is implied, the facts out of which it is claimed to arise must be pleaded.

2.  ———: ———: ———: CASE STATED. Plaintiff furnished defendant the money to buy an option on real estate, and afterwards sued him for her share of the profits and in her petition stated that it was "understood and agreed that the profits and losses, if any, of the venture should be shared equally between them." *Held*, that this was not such a pleading of an express contract as to debar the plaintiff's recovery, there being no evidence of an express agreement. *Held*, also, that the law will supply by implication what the parties intended but failed to express.

3.  Implied Contract: SKILL AGAINST MONEY.: EQUAL SHARE IN PROFITS. Where two persons associate themselves together to buy an option in land, she furnishing the money, and he the skill and services essential to make the business a success, and both thereby become jointly interested in the venture without any express agreement as to the division of profits, the rule, both in law and equity, is that the profits shall be shared equally between them.

4.  ———: INTERPRETATION BY PARTIES. The interpretation that parties by their action seem to put upon it is of service in construing an ambiguous contract, or in ascertaining what the contract really was if its terms are in dispute. But when its terms are certain and its meaning clear, a construction by the parties at variance with its terms or meaning will not control the courts in construing it, unless the conduct of one party, in following a meaning placed upon it by both, has misled the other to his disadvantage.

5.  ———: ———: SHARING IN BUSINESS VENTURE. So that if the facts establish an implied agreement under which each party thereto was to share equally in the profits arising from the purchase of real estate, that implication is conclusive, although plaintiff, who furnished the money for the purchase of the option, may, through inexperience and ignorance of the law, have supposed she was entitled only to what defendant chose to give her.

6. ————: ACCORD AND SATISFACTION. The payment of a smaller sum than is unquestionably due, and which has no other element of accord in it than mere payment, is not a satisfaction of the debt even though accepted as such at the time.

*Appeal from St. Louis County Circuit Court.*—HON. RUDOLPH HIRZEL, Judge.

REVERSED AND REMANDED.

W. M. KINSEY and J. J. MCCANN for appellant.

(1) The court erred in sustaining respondent's demurrer to the evidence. The transaction was a joint venture in which, by express agreement, the loss if any was to be shared equally between the parties, and, by implication of law, the profits, if any, were to be shared in like manner. Brigham v. Dana, 29 Vt. 1; Richards v. Grinnell, 63 Ia. 44; Whitcomb v. Converse, 119 Mass. 44. (2) Where parties engage in a joint venture, or become co-owners, but not partners within the legal definition of that term, their rights and liabilities as to profits and losses are settled upon the general principles governing the law of partnership as to those matters, in the absence of express stipulation. Lindley on Partnership (2 Am. Ed.), pp. 51 to 53; Parsons on Partnership (4 Ed.), p. 53. (3) The rule as to joint ownership of either real or personal property sustains, by strong analogy, appellant's contention in this case. "The shares of joint tenants and tenant in common are presumed to be equal." Freeman on Co-tenancy and Par. (2d Ed.), sec. 105; Compton v. Compton, 44 Mich. 31; Shiels v. Stark, 14 Ga. 437; Nippel v. Hammond, 4 Col. 218; 1 Schouler on Personal Property, 187. (4) The acceptance by appellant of the $430 on May 9th, 1889, when the $6,500 of stock was exchanged for the Redmond Cleary property, was not a settlement, because it was neither tendered nor accepted as such. Brigham v. Dana, 29 Vt. 1. And if it had been, the acceptance was not binding,

Wetmore v. Crouch.

both for want of consideration and because respondent failed to disclose to appellant the fact that he had received $3,700 in cash as part of the profits of the venture in addition to the $6,500 in stock.

JNO. H. DRABELLE for respondent.

(1) An express agreement that the plaintiff and defendant were to share equally the profits and losses of the alleged venture is averred. It is admitted that there is no proof of such express agreement. Hence, the court was right in sustaining the demurrer to the evidence. (2) Where an express contract is declared on, evidence of an implied contract can not be received. 4 Encly. of Pleading, p. 927; Yeates v. Ballentine, 56 Mo. 530; Eyerman v. Cemetery Ass'n, 61 Mo. 489; Davis v. Brown, 67 Mo. 313; Lewis v. Slack, 27 Mo. App. 119; Traders Bank v. Payne, 31 Mo. App. 512: Hence, the court was right in sustaining the demurrer to the evidence. (3) If plaintiff proved a contract different from the one declared on, he can not recover. 2 Encly. of Pleading, p. 998. (4) There can be no implied contract when an express contract exists: So the law never raises a promise when the evidence shows the parties intended none. Also, the law will not imply a promise of any person against his own declaration, because such declaration is repugnant to any implication of promise. Savings Bank v. Aull, 80 Mo. 199; Morris v. Barnes, 35 Mo. 412; Guenther v. Birchit, 22 Mo. 439; Hart v. Hart, 41 Mo. 441; Sints v. Taylor, 20 Mo. App. 166. (5) The evidence in this case, even if it can be held to sustain the allegations of the petition in regard to the contract, negatives any contract, either express or implied, by the defendant to pay plaintiff any definite part of the profits of the venture, and hence there can be no recovery. Wetmore v. Crouch, 55 Mo. App. 441. (6) The plaintiff received and accepted from defendant $500 worth of the stock representing her profits of

the alleged venture, knowing at that time that the profits realized were as much as $6,500; accepted the $250 and delivered up to defendant the alleged receipt therefor. This was done in the absence of any fraud or misrepresentation, or claim of such, the record disclosing that the plaintiff was a woman of more than ordinary capacity and shrewdness. This constituted not only a settlement of the transaction, but also an interpretation by the parties themselves of the alleged agreement. "Actions speak louder than words." 11 Am. and Eng. Ency. of Law, p. 518; Price's Heirs v. Evans, 26 Mo. 49; Gas Light Co. v. St. Louis, 46 Mo. 121.

VALLIANT, J.—This is an action begun April 17, 1894, to recover the value of the plaintiff's share of the profits which she claims accrued in a venture entered into jointly by herself and defendant.

The petition states substantially, that in 1888, at the proposal of defendant, plaintiff advanced him $250 to purchase upon their joint account a half interest in an option on certain real estate near the city of St. Louis, with the understanding and agreement that the profits and losses of the venture should be shared equally between them; that the purchase was made by defendant and afterward sold by him to a real estate corporation called the Kenwood Investment Company, whereby the defendant received in cash $3,700 and 260 shares of stock in the Kenwood Investment Company worth $25 a share; that defendant represented to plaintiff that the 260 shares of stock was all that he had realized, fraudulently concealing that he had received $3,700; the defendant procured this stock to be issued in three certificates, one for 40 shares amounting to $1,000 face value in his own name, one for 200 shares, face value $5,000 in plaintiff's name, and one for 20 shares, face value $500, also in plaintiff's name, which two last named certificates plaintiff, at the request of defendant, transferred to defendant's wife for the purpose of enabling defendant to

handle them in the market for the joint benefit of plaintiff and defendant; that defendant sold all of this stock May 9, 1889, and received in payment $2,100 in cash and a house and lot in St. Louis at a valuation of $4,000, the title to which he took in his wife's name, thus with the $3,700 above mentioned defendant realized in all $9,800, of which $4,900 justly belongs to plaintiff, on which the defendant has paid her $650 and refuses to pay her more; judgment for $4,250 and interest is prayed.

The answer was a general denial and the statute of limitations. The reply was that this suit was brought within one year after a nonsuit in the same cause of action suffered by plaintiff.

Plaintiff in her own behalf testified substantially that she was a teacher in the public schools of St. Louis and the defendant was the husband of her sister; in the spring of 1888, she loaned defendant $250 and took his note for the amount; shortly afterward he came to her prepared to pay the note, and was willing to do so, but proposed to her that instead of taking the money back she allow him to invest it for their joint interest in an option on what was known as the Benton farm; there was some discussion about the risk, in which he said there was not much risk and he thought they would make a good deal of money out of it. Then she agreed to let him use the money in that venture and he gave her a receipt in these words: "Received of Miss Octavia Wetmore $250 to be used on the Benton farm option," and she gave him back the note she had held. After the note was returned to him and the receipt had been given, he said "We are liable to make a good deal of money out of this and I would like to limit you;" and just before he left he said, "If we don't succeed I will refund half of this $250." That was all that was said on the subject of sharing the profits and losses. The next meeting between plaintiff and defendant was in August, 1888, when he came to her and informed her that he and Mr. Greenwood, who owned

the other half, had sold the option at a net profit of $13,000 to be paid in stock of the Kenwood Investment Company. Plaintiff told him that he had done well, to which he replied that he would rather have had money. Proceeding, the witness said: "Then he asked me if I wanted money. I told him I didn't need any money, and he took out the $250 that I had given him to pay for the option, and said, 'Well, take this any way, and I will have some certificates of stock made out.' He did not at that time say anything about the receipt which he had given me for the $250. A day or two after that he brought up some certificates of stock. One was made out for $5,000 worth of stock in my name, being for 200 shares; another for $500 worth of stock, being 20 shares, also in my name, and one for $1,000 worth of stock being 40 shares in his own name, and he then asked me to transfer the 200 shares of stock to his wife, and I did so. I had not had at this time any experience in dealing either in options or real estate. I did not know anything about dealing in options. It had been Mr. Crouch's business for some time to deal in options and real estate generally. He had been in the business two or three years. It was at Mr. Crouch's request that I indorsed the certificate for 200 shares of this stock to his wife, and he then took the certificate. After he had taken the certificate he said: 'Now, I wish you would give me that receipt, because if you should die, it might be found among your effects and people would wonder.' He then took the receipt and the certificate for 200 shares of stock away with him. He held the certificate until the next spring, either in April or May, 1889, when I asked him why he did not dispose of the stock. He replied that he had tried to but had not succeeded. A short time after this he came to me and said he could exchange it for a house and lot and some money, and asked me what I thought of it. I told him if that was the best he could do, to do so. He said the stock would have to be pooled, that is, his stock, mine and his wife's, and he afterward informed me that

the stock had been exchanged for a house and lot and some money, I think about $2,200. By his wife's stock I mean the certificate for 200 shares which I transferred to her at his request the previous August. He had the deed to this house and lot made out in my name. He put into the pool the two certificates made out in my name, the one in his own name, and one for ten shares in the name of Mr. Spencer. For all this stock he got the house and lot and about $2,200 in money; he said he would retain about $1,700 of this money and gave me about $400, and he did give me $430 of it about May 9th, 1889." (At this point appellant offered in evidence the deed to this house and lot from Redmond Cleary to herself, dated May 9th, 1889, which recited a consideration of $4,000). "I afterwards authorized him in writing to collect the rents; this was done at his request. A few days afterward he requested me to go to the office of Mr. Greenwood and execute a deed for this house and lot to his wife, which I did." (This deed was also offered in evidence and was dated May 10th, and acknowledged May 17th, 1889, and recited a consideration of $4,500.) "Sometime after August 22d, 1889, I wrote Mr. Crouch a letter asking him for a settlement and telling him 'that as I had furnished the money for the option, I was entitled to at least half the proceeds, as I was to bear half the losses.' To this letter he made no reply. I again wrote him on the same subject, and received a postal card in reply dated February 14th, 1890, in which he excused himself for not calling on me, but promised to see me in a few days."

In a letter written by respondent to appellant, dated September 18th, 1888, and read in evidence, he refers to this $6,500 worth of stock and says: "Mr. G. wishes to know to-day what I would take to-day for my $6,500 worth of stock and as you are the owner of a portion of this stock, I would like to have your price on all or any portion of yours." Testifying further, witness said she first learned about a year before the trial, viz., in November, 1895, that Mr. Crouch received a sum

of money as part of the profits of the deal in addition to the $6,500 worth of stock. The amended petition charging that fact was filed April 23d, 1896.

On cross-examination, the witness was led back to the original conversation when the $250 was advanced and this occurred:

"Q. What did you say to him? A. I said it was a good deal of money for me to put up on an option. Q. What did he then say? A. He said he thought I didn't run much risk in doing it. Q. What then did he say? A. That he thought we would make a good deal of money out of it. I thought the matter over a little while and said I would do it. Then he wrote the receipt. Q. He said he wanted this $250 from you for the purpose of buying a half interest in the Benton farm? A. Yes, sir. Q. And you say that you gave him the money for that purpose and this receipt was given, saying that was the purpose for which it was given? A. Yes, sir; he said after he wrote out the receipt: 'I would like to limit you,' and just before he went away he said, 'If we don't succeed I will pay you back one-half.' Q. Now that was all that was said? A. That is all I remember. Q. What did he say to you in August about this transaction? A. He said that Mr. Greenwood had made a sale; that the profits were $15,000; that $2,000 would have to be reserved for expenses, and that would leave $6,500, or $13,000 to be divided between Mr. Greenwood and us. He then asked me if I wanted money. I said I did not need money. He then took out the $250 and said, 'Well take this, this is the money that was put up on the option," and I took it. He did not say where he got the money. He said he would much rather have money, but that he would have to take the $6,500 in stock. He asked me how much of the stock I wanted. I said I did not know, because I did not know my rights in the case at the time. Q. Now, if 'we had made $6,500,' why didn't you tell him the amount of the stock you were entitled

to? A. I didn't know my rights and he did not inform me. He was the business man of the firm. It was my first experience in options. At our second interview in August he brought two certificates of stock; one was for 200 shares and the other for 20 shares, of the value of $25 each, and both were in my name. He requested me to transfer the one for 200 shares to his wife, and I did it. Q. Why did you do this, Miss Wetmore? A. Because I had the utmost confidence in Mr. Crouch and didn't think for a moment he would try to deceive me, and $5,000 out of $6,500 would have been more than my share. That was my only reason."

The witness' attention was then called to the letter of September 18th, 1888, above quoted, and her answer to it in which she says: "I shall certainly not set any price on your stock . . . but I would be willing to take $400 cash for my 20 shares." Concerning this she testified: "At the time I wrote this letter, 200 shares of this stock had been transferred to Mrs. Crouch, Mr. Crouch had 40 shares and I had 20 shares. I could not very well consider the 200 shares as mine under the circumstances, and I referred to the 20 shares as mine and the 40 shares as Mr. Crouch's. At the time all of this stock was sold (May, 1889) I got something less than $450. I did not at that time say anything to Mr. Crouch, nor he to me, about wanting more than this sum as my share out of this transaction, because I was waiting for him to get out of his business difficulties to make a final settlement with me."

To sustain the allegation that defendant had received $3,700 in money besides the 260 shares of stock in question, the petition in a suit in the circuit court of the city of St. Louis wherein this defendant was plaintiff and Moses Greenwood, Jr., was defendant was read in evidence in which petition that fact was stated. The deposition of one Hugh A. Wetmore was read in which he testified that on Thanksgiving day, 1888, defendant said to him, "I would not have gotten into that Kenwood option without Octavia's money. She fur-

nished $250, and had the deal failed to go through I would have paid back $125.   By rights she should have half of all I made, but she is very generous and has not asked for it."

Here the plaintiff rested and at the request of the defendant the court gave an instruction to the effect that under the pleadings and evidence the plaintiff could not recover.   After a motion to set aside the nonsuit, which was overruled, the bill of exceptions was filed and the case brought here on appeal.

The learned trial judge in giving the instruction forcing a nonsuit, doubtless deferred to the opinion of the St. Louis Court of Appeals in Wetmore v. Crouch, 55 Mo. App. 441, which was a suit between these parties growing out of this same transaction.   But whilst the same transaction which is the subject of this was at the bottom of that suit, yet the two cases are quite different in essential particulars.   In the former suit the plaintiff's chief difficulty was in her petition, which essayed to be a bill in equity to set aside an alleged settlement and for an accounting, without stating any grounds to impeach the validity of the settlement and without stating what share the plaintiff had in the business.   In her petition in this suit the plaintiff states a cause of action for a certain amount of money which has come into defendant's hands belonging to her as her share of the profits arising out of a business venture for which she had furnished the capital and which was conducted by defendant for their joint interest.   The difference between the positions assumed by the plaintiff in the two suits consists more in the deductions made from the facts stated, than from the facts themselves.   Courts are more tolerant of a change of front where it consists of a change in legal conclusions drawn in the light of an adverse decision, than where an attempt is made to change the facts to suit the emergency.

The testimony as to what passed between the parties when the money was advanced is substantially the same in this as it was in that case, but there the only statement in the petition in regard to an agreement for division of profits was, that

if the venture was a failure defendant was to refund half the money advanced and if profitable "both were to make considerable profit out of it." And so as to the facts which went to make up what, in the petition in the former suit, was called a settlement, and which are here treated as partial payments on account, they were substantially the same.

The petition in this case concludes the statement of the agreement as follows: "It being further understood and agreed that the profits and losses if any, of the venture should be shared equally between them." Counsel for respondent construe this to be the pleading of an express agreement, and contend that plaintiff must fail because there was no evidence of an express agreement to divide the profits equally. But we do not agree with that view. If the facts stated are such as that the law implies such an agreement, the pleader may with propriety after stating the facts draw that conclusion. The counsel is correct to this extent, if the contract relied on is express, it must be so pleaded, but if it is implied, the facts out of which it is claimed to arise must be pleaded. Wells v. Railroad, 35 Mo. 164, and the other authorities cited in the brief of respondent sustain this view.

There was no express agreement between these parties as to how the profits that were expected to arise out of this venture were to be divided between them, but the facts are given in evidence and the law will supply by implication what they intended but failed to express.

Under the circumstances of the case as testified to by the plaintiff we must reach one or another of the following conclusions: That the plaintiff loaned defendant the $250 to invest for his own account, in which event she would have no interest in the result, or that she intrusted it to him to invest for her own account, in which event she would be entitled to all the profits; or that she intrusted it to him to invest for their joint account in which event she would be entitled to one-half the profits.

That it was not a loan is shown by the fact that she gave him back his note which up to that time had evidenced a loan, took a receipt which specified that the money was to be invested, and discussed the risk and prospective profits. His promise to pay back half the amount in case the scheme failed can scarcely be called a part of the contract since it occurred after the transaction had been closed and just before he went away; it was rather as a voluntary promise.

Nor is the inference that the investment was to be for the plaintiff's sole benefit the most reasonable, because although she furnished all the money, yet his skill and services were as essential to the business as her money.

The natural inference is that it was a putting together her money and his skill for their joint benefit.

The transaction did not constitute them partners in the full sense of the term, but they became jointly interested in the venture, and to some extent in a relation analogous to that of co-partners. Under the law of partnership where there is no express agreement as to division of profits, "it is certainly the general rule, both in law and equity, that the profits shall be shared equally among the partners." [Parsons on Part. (4 Ed.), sec. 172 and note 1 and cases there cited.]

And "the rule that the shares of partners are equal, unless they have otherwise agreed, applies not only to persons who are in business generally, but also to those who are partners as regards one single matter only." Lindley on Part. (2 Ed.), star page 350. That rule so commends itself in reason and justice that it needs no authority to support it.

It is insisted by respondent that the parties themselves put a different construction on the contract and that their "actions speak louder than words." The interpretation that parties by their actions seem to put upon it is of service in the interpretation of an ambiguous contract, or in ascertaining what the contract really was if its terms are in dispute. But when the terms of the contract are certain and its meaning is

Wetmore v. Crouch.

clear the conduct of the parties under it indicating that they
put a construction upon it at variance with its true meaning,
will not control the court in construing it, nor in adjudging
the rights of the parties under it, unless the conduct of the one
has been such as to mislead the other to his disadvantage.
And so in the case at bar, if in point of fact there was no
express agreement as to the share that each was to have in the
profits, and if the conditions were such that the law implied
an agreement for an equal division, that implication was con-
clusive, and would not be changed even though the plaintiff
through inexperience or ignorance of law might have supposed
that she was entitled only to what defendant chose to give her.

A transaction which consists only in the payment of a
smaller sum than is unquestionably due, and which has no
other element of accord in it, is not a satisfaction of the debt
even though accepted as such at the time. [Riley v. Kershaw,
52 Mo. 224; Swofford Bros. Dry Goods Co. v. Goss, 65 Mo.
App. 55.]

But the transactions that occurred between these parties,
so far as the evidence has gone, do not indicate that they were
intended as a final settlement by either party.    First, after
refunding the $250, the defendant caused the stock to the
amount of $5,500 to be issued in the name of the plaintiff,
that was the first division of the profits; then this stock without
consideration was transferred to defendant's wife, who had no
interest in it at all; then it was, together with the 40 shares
held in defendant's name, sold to a stranger for $2,100 and a
house and lot valued at $4,000, defendant receiving the money
and taking title to the real estate in plaintiff's name; then the
house and lot were transferred without consideration to the
defendant's wife; after that defendant paid plaintiff $430.
Thus we see that which represented the profits in this venture
was shifted from one to the other, in unequal proportions, from
time to time as the defendant requested, and there is no more
reason for defendant to claim the $430 payment to be a final

settlement, than there would have been for the plaintiff to have kept the $5,500 worth of stock, or to have kept the house and lot, and insisted that either of those transactions was a final settlement. The whole business shows that plaintiff confided implicitly in defendant, and whatever disadvantage she is laboring under now is referable to that fact. The court erred in giving the instruction which forced a nonsuit.

The judgment of the circuit court is reversed and the cause remanded to that court to be retried in accordance with the law as herein declared. All concur.