NEW AMSTERDAM CASUALTY COMPANY, Respondent, v. MESKER et al., Appellants.

St. Louis Court of Appeals, December 17, 1907.

1. **ACCORD AND SATISFACTION: Claim not Controverted: Employers'. Liability Insurance.** Where an insurance company, having issued employers' liability policies to manufacturers to insure the latter against claims for injuries to employees, demanded of the manufacturers a statement of the wages paid during the year covered by the policies, in order to determine the amount of premiums earned, and where the manufacturers furnished such a statement and the insurance company presented a bill for the premiums based thereon, which was paid by the manufacturers, this was not an accord and satisfaction, because there was no controversy as to the amount of the bill, and it did not prevent a recovery by the insurance company of the difference between what was paid and what was really earned.

2. **INSURANCE: Employers' Liability Policies: Designation of Business: Classification of Employees.** Employers' liability policies, issued by an insurance company to manufacturers to protect the latter against loss on account of injuries to their employees, provided under the caption, "trade or kind of work," the designation "galvanized iron, cornice and wrought iron work;" these words were intended to describe the business carried on in the shops of the manufacturers and not to specify the classes of workers, so that tinners, skylight workers, shippers, machinists and carpenters employed in the same shops, whose tasks contributed to the manufacture of cornice and wrought iron work, were included in the list of employees sought to be embraced in the provisions of the policies, especially where the manufacturers so construed the contracts by preferring claims for injuries to such employees.

3. ——: ——: ——: ——. In an action for earned premiums upon employers' liability policies with such designation of the employees within the provisions of the policies, other provisons of the policies are examined and held to be consistent with such interpretation.

4. ——: ——: ——: ——: Employers' liability policies of insurance were issued by an insurance company to manufacturers to insure them against risks from injuries to employees, and in such policies under the heading, "kind of work," the blank was filled to read "galvanized and sheet iron workers, wrought iron work, erecting." Tinners who worked outside the factory in galvanized and sheet iron as well as tin, came within the provisions of the policies as employees insured against.

5. ———: ———: ———: ———. But where such policies were issued, some of which were intended to embrace within their provisions workers inside the factory and others intended to embrace workers outside the factory, the premiums being much less for inside work than for outside work, and where tinners coming within the terms of the policy were shown to work both inside and outside, but the amount of work and wages paid for inside and outside work by tinners were not separated, such wages being the basis for the apportionment of the premiums, in an action for earned premiums on the policies, it was error to allow the premiums earned on account of the tinners without evidence showing the proportion of work done inside and outside.

Appeal from St. Louis City Circuit Court.—*Hon. Robt. M. Foster*, Judge.

REVERSED AND REMANDED.

*R. M. Nichols* for appellant.

(1) The term "employee" as used in section D, under the rule of *norchitur a sociis*, is to be construed and limited by the words and phrases as used in section 4, called schedule, of "wages;" "trade or kind of business;" "manual classification;" "pay-roll;" "premium per rate of $100 for wages;" "galvanized iron cornice and wrought iron work;" and the word "compensation" as used in section D must be construed with the words contained in the schedule, section 4, of: "Manual classification;" "pay-roll;" "number of employees;" "wages;" "trade or kind of business;" and "galvanized iron cornice and wrought iron work including drivers;" and when thus construed the premium can be estimated only upon wages paid to persons engaged in the manual classification embodied in the terms of "galvanized iron cornice and wrought iron work and driving." People v. Buffalo, 57 Hun 577; Wakefield v. Fargo, 90 N. Y. 213; Lewis v. Fisher, 80 Md. 139, 30 Atl. 608; Johnson v. Barrells, 27 Ore. 251, 41 Pac. 656; Railroad v. Wilson, 138 U. S. 501, 34 L. Ed. 1023; 21 Am. & Eng. Ency. Law (2 Ed.), p. 555; Pothier on Obligations, p.

59 (and cases cited); County of Johnson v. Wood, 84 Mo. 489; Grambley v. Webb, 44 Mo. 444; Schulenberg v. Maguire, 42 Mo. 391; Garland v. Smith, 164 Mo. 14. (2) The claim for excess premium paid November 16, 1903, was an unliquidated demand and it was disputed as to what wages should be counted. Defendants estimated the excess pay-roll on the number of employees in the trade or business described as "galvanized iron cornice and wrought iron work." Books were open to plaintiff at the time, to determine whether or not the estimated wages were correct. They made no such inquiry, but accepted the defendant's estimate and received the $165.40 in settlement. The $165.40 was not paid on account but was paid in settlement. A disputed or an unliquidated claim, may be settled by the payment of part in settlement of the whole. Fidelity & Casualty Co. v. Gillette, Herzog Mfg. Co., 92 Minn. 354; 2 Cooley's Brief on Law of Insurance, p. 921; Helling v. United Order of Honor, 29 Mo. App. 309; Lightfoot v. Hurd, 113 Mo. App. 612; Andrews v. Stubbs Con. Co., 100 Mo. App. 600; Pollman Bros. C. & S. Co. v. St. Louis, 145 Mo. 651.

*C. P. Ellerbe* and *Linn R. Brokaw* for respondent.

(1) The meaning of a contract is not to be gathered from any isolated term or expression, but depends upon a fair interpretation of the instrument taken as a whole, and in construing the contract words should be given their ordinary meaning. County of Johnson v. Wood, 84 Mo. 509; Schulenberg v. Maguire, 40 Mo. 395; Maguire v. Lancaster, 100 Mo. App. 116; Meyer v. Christopher, 176 Mo. 580; Brown v. Railroad, 102 Wis. 137. (2) If the contract admits of different interpretations it is competent to show the construction put upon it by the acts of the parties themselves and that interpretation will be adopted by the court. Ireland v. Spikard, 95 Mo. App. 53; Construction Co. v. Tie Co.,

185 Mo. 25; Lighting Co. v. Hobart, 98 Mo. App. 227; Morton v. Supreme Council, 100 Mo. App. 76; Fuller Bros. v. Fidelity & Casualty Co., 94 Mo. App. 490.    (3) The referee's finding that the appellants carried on their business under the terms designated as "galvanized iron workers and wrought iron work" is supported by the testimony of both appellants' and respondent's witnesses, and the policies involved called only for terms generally descriptive of the work or business.    Insurance Co. v. Lumber Co., 83 Fed. 977; Elliott on Insurance, p. 452, par. 411.    (4)  It was not the intention of either of the parties to the contract, or of the contract itself, to limit the liability to operations in any particular department, or to any particular branch of the business, or to any particular instrumentality used in the business.    The policy was designed to cover all of the employees of the assured engaged in each and every department of the assured's business.    Hoven v. Employers Assur. Corp., 93 Wis. 201.    (5) Accord and satisfaction is the making and performing of a new contract in discharge of the old one and the making of this new contract must be supported by a consideration. If the claim is undisputed a part payment will not extinguish the remainder of the indebtedness, as there is no consideration to validate such a discharge.    Griffith v. Creighton, 61 Mo. App. 1; Dry Goods Co. v. Goss, 65 Mo. App. 55; Tompkins v. Hill, 145 Mass. 379; Scase v. Manufacturing Co., 55 Minn. 349; Scully v. Delamater, 28 Fed. 114.

GOODE, J.—The purpose of this action is to recover from the defendants, who are partners, certain sums of money alleged to be due the plaintiff as a portion of premiums earned on six policies of insurance. The insurance was of the Employer's Liability kind and was intended to indemnify the defendants against losses for personal injuries occurring to their employees

and other persons, in the course of defendant's business. There were three policies for the year from June 19, 1902, to June 19, 1903, and three other policies for the ensuing year to June 19, 1904.     In addition to those six policies, which constitute the subject-matter of plaintiff's petition, there were three other policies of a like sort issued for the year from June 19, 1904, to June 19, 1905, but cancelled by plaintiff pursuant to the terms of the policies, on September 24, 1904.     The last three policies form the subject-matter of a counterclaim preferred by the defendants, who allege in their answer that plaintiff is indebted to them in the sum of $185.21, which they paid in advance, as premiums in excess of the premiums actually earned while the policies were in force.     The answer contains a general denial of all the allegations contained in the petition, and also pleads an accord and satisfaction in defense of the action on the first three policies declared on in the petition, to-wit, those covering the period from June 19, 1902, to June 19, 1903.     The facts on which this defense rests will appear from the further statement of the case.     The petition is in six counts of which the first three, as indicated, are based on the three policies issued for the first year and the second three counts on the three policies issued for the second year.     The gravamen of plaintiff's case is this: the premium to be paid for each policy was stipulated to be based on the total compensation paid by defendants on the whole number of their employees during the period covered by the policy; and as it could not be known when a policy was issued, what would be the total compensation to employees during the ensuing year, an approximate estimate of the amount was made and the premium paid in advance in proportion to such estimate.     The policy provided that such estimate should be provisional   only,   and if it turned out that there was more compensation paid to employees than was estimated, there was to be a

proportionate increase of premium paid by defendants; whereas if it turned out there was less compensation paid, a proportionate part of the premium already paid should be returned to defendants.    The averments in the first count of the petition are that the rate of premium under the policy was sixty-seven and one-half cents for each one hundred dollars of wages paid during the year from June 19, 1902 to June 19, 1903; that the estimated pay-roll for said period was $15,000 and the total amount of premium paid $101.25; that it turned out defendants actually paid for employees' wages during said term $30,000 more than was estimated, and, therefore, defendants became indebted to plaintiff for an additional premium covering said excess of the pay-roll in the sum of $202.50, for which judgment was prayed.    In the second count it is stated that the rate of premium declared on in said count was $4 for each one hundred dollars of wages paid during the year for manufacturing and erecting galvanized, sheet and wrought iron work in Louisiana, Kansas, Missouri, Minnesota and all States east of the Mississippi river, and the entire premium paid was $120; that the wages for said year for said work were estimated to be $3,000, but during the period defendants actually paid to employees engaged in the work aforesaid in said territory, $20,000 in excess of the estimated amount, and therefore became indebted to plaintiff for an additional premium in the sum of $800.    The third count states that the policy declared on was issued in consideration of a premium of $45, based on a pay-roll of wages for the year estimated to amount to $3,000, said premium being at the rate of $1.50 for each one hundred dollars of wages actually paid for erecting galvanized, sheet and wrought iron work in the States aforesaid; that during the year covered, defendants actually paid to their employees engaged in said work in said territory, $20,000 in excess of the estimate and therefore became

indebted to plaintiff for an additional premium in the sum of $300. The other three counts contained similar allegations on three policies identical with the first three, except that they were for the year from June 19. 1903 to June 19, 1904. The amount claimed under the fourth count for additional premium is $337.50; under the fifth count, $1,000, and under the sixth count $375. We will now describe the three varieties of policies in suit. The two covered by the first and fourth counts were exactly alike, except as stated, that one was for the year from June 19, 1902 to June 19, 1903, and the second for the ensuing year. Those policies purported to insure the defendants against loss from common law or statutory liability for damages on account of bodily injuries, accidentally suffered within the period of the respective policies by employees of the defendants, "while on duty within the factory, shop and yards mentioned in the schedule hereinafter given or upon the ways immediately adjacent thereto, provided for the use of said employees and the public, in and during the operation of the trade or business described in the schedule and against the expense of defending a suit for such damages." Another clause of the policies provided, among other things, as follows:

"This policy does not cover loss . . . for injuries to, or caused by any person unless his wages are included in the estimated wages hereinafter set forth and he is on duty at the time of the accident in an occupation hereinafter described, at the place or places mentioned in the schedule; but drivers and drivers' helpers while on duty in the employ of the assured at places other than those mentioned in the schedule shall not be excluded from this insurance, provided they are enumerated and their estimated wages are stated in the schedule."

The policies contained this provision in regard to the premium:

"The premium is based on the compensation to employees to be expended by the assured during the period of this policy.    If the compensation actually expended exceeds the sum stated in the schedule hereinafter given, the assured shall pay the additional premium earned; if less than the sum stated the company will return to the assured the unearned premium pro rata; but the company shall first retain not less than twenty-five dollars ($25.00), it being understood and agreed that this sum shall be the minimum earned premium under this policy."

The schedule referred to in the paragraph from which we first quoted, in so far as it bears on the question at issue, is as follows:

"4.    The factories, shops or yards are located as stated below.    The trade or kind of business carried on at each such location, and the number of employees and the pay-roll at each such location, are as follows:

"(Enter in "Trade or Kind of Business" column the precise manual classification.    Enter each manual classification separately when pay-roll is divided under manual rule.    Give number of employees, pay-roll, premium rate, and amount of premium opposite each classification.    If drivers and drivers' helpers are to be covered, they must be enumerated and their pay-roll must be stated.

| Trade or Kind of Business | Estimated Average Number of Employees | Estimated Pay–Roll for Policy Term | Premium Rate $100 of Wages | Amount of Premium | Location of Plant. |
|---|---|---|---|---|---|
| Galvanized iron cornice and wrought iron work, including drivers | | 14500  500 | 67½ | 101 25 | 421 to 519 So. 6th St. 601 to 615 Poplar St. 506 So. 7th Street and connecting bridge.  St. Louis, Mo. |

"5.    The operations carried on are those usual to the trade or kind of business described herein.

* * * * * *

"12.    The estimated pay-roll covers the wages of all persons employed by the assured on the premises

mentioned in statement No. 4 including executive officers, office employees, piece workers, and drivers and drivers' helpers except as follows: Executive officers and office men.

\*        \*        \*        \*        \*        \*

"16.   The total expenditure for wages for the last calendar year (ended December 31, 1——) was $——

"17.   The minimum premium for this policy is $25.

The policies declared on in counts two and five of the petition are, in their general tenor, the same as the two just noticed, except that instead  of insuring the defendants against liability for injuries to defendants' employees in their St. Louis shops, they insured against injury to employees in galvanized, sheet and wrought iron work and erecting work in the States aforesaid. The material divergences from the policies already noticed are as follows:

"4.   The place or places where work is to be carried on, the kind of work at each such place, the number of employees, and the estimated pay-roll at each such place are as follows:

"(Enter in 'Kind of Work' column the precise manual classification.     Enter each manual classification separately when pay-roll is divided under manual rule. Give number of employees, pay-roll, premium rate and amount of premium opposite each classification.     If drivers and drivers' helpers are to be covered, they must be enumerated and their pay-roll must be stated.)

| Kind of Work | Estimated Average Number of Employes | Estimated Pay-Roll for Policy Term | Premium Rate Per $100 of Wages | Amount of Premium | Places where Work is to be Done |
|---|---|---|---|---|---|
| Galvanized iron & sheet iron workers, wrought iron work, erecting. | | 3000 | 4.00 | 120.00 | States of Louisiana, Arkansas, Kansas, Missouri, Iowa, Minnesota, and all States east of the Mississippi River. |

\* \* \* \* \* \*

"10. The estimated pay-roll covers the wages of all persons employed by the assured at the places mentioned in statement No. 4 including executive officers, office employees, drivers and drivers' helpers, except as follows: Executive officers and office men."

The policies declared on in counts three and six of the petition are like the others, except that, instead of insuring defendants against loss for injuries, to employees in defendants' shop or engaged in outside work in the States mentioned, it covered liability for injuries to persons *not employed by the defendants* suffered at or about the work of defendants in erecting galvanized sheet and wrought iron work in the states aforesaid. The provisions and the schedule of said policies, except as to non-employees instead of employees being within the risk, are like those of the outside policies insuring employees and from which we have quoted such parts as are relevant to the questions involved in this litigation. It is to be noted that the premium rate on the outside employees policies was $4 on each hundred dollars of wages; whereas the rate on the non-employees policies was $1.50. There was a slight variation in the provisions of the two kinds of policies. in relation to accidents to or caused by drivers; but this discrepancy does not concern us. Every policy contained the same stipulation in regard to the premium being based on the compensation paid to employees during the year, and all the policies were practically the same so far as the points before us are concerned, except in the particulars stated. It was provided that the insurance company could examine the books of the defendants so far as they related to compensation to employees, and that the company should be furnished by defendants with a written statement of the amount of compensation paid during the period. This action is based on the result of an examination of defendant's books by

an auditor of the company in July, 1904.    On August 7, 1903, the company wrote the defendants, requesting the latter to fill out an inclosed pay-roll blank. under the three policies covering the period from June 19, 1902, to June 19, 1903; that is to say, the three first issued.    This request, though addressed to defendants, was sent by plaintiff to Hirschberg & Bro., an insurance agency in St. Louis, and was mailed to defendants by R. H. McMath, an employee of said Hirschberg & Bro.    The insurance in question had originally been procured by the defendants through said McMath, as their agent or broker.    In compliance with the request, defendants filled the blank and sent it to the company. The blank form as filled purported to state the actual pay-rolls under the three policies for the year covered. In estimating the pay-roll the defendants excluded the wages of certain employees which the plaintiff company claims should have been included.    As estimated by defendants the poy-roll showed an additional premium was due the company on the three policies of $165.65, and a bill for that sum was made out by plaintiff and collected from the defendants.    The whole matter was transacted through the agency of Hirchberg & Bro.    On this payment of increased premiums, the defendants found their defense of accord and satisfaction.    But the plaintiff contends that even the increased premium paid fell short of what was due, in consequence of the exclusion from the pay-roll of the wages of certain employees that should have been included.    Plaintiff further contends there had been no controversy or dispute between the parties at the time the additional premium was paid, and hence the payment did not amount to a settlement. and compromise of a bona fide controversy, and, as the payment was less than was due, that it was not a satisfaction of plaintiff's demand.    As to defendant's counterclaim for the excessive premiums paid on the three

cancelled policies running from June, 1904, to June, 1905, and cancelled September, 1904, the company contends the policies earned more while they were in force than was paid. The question running through the entire controversy is regarding what wages ought to be included in the statement of compensation paid to employees during the year covered by each policy as a basis from which to compute the premium due on the policy—the wages of what classes of employees. The exact point at issue between the parties may be illustrated from the schedules in the policies declared on in the first and fourth counts. Those schedules contained, under the head of "Trade or Kind of Business," these words: "Galvanized iron cornice and wrought iron work, including drivers." It is the contention of the defendants that in computing the wages of employees on which the premium was to be based, no wages should be included except of employees who actually worked in defendants' St. Louis shops on Sixth, Seventh and Poplar streets, and whose work was on galvanized iron cornices and wrought iron work and driving teams. But defendants had in their said shops many employees who neither worked directly on cornices nor wrought iron work, nor as drivers. These other employees were: (a) workers on skylights for buildings; that is, those who made skylights to be put on buildings by defendants or sold to customers; (b) tinners who worked on tin in the shops; (c) carpenters who worked in wood; (d) shippers who packed and unpacked material received or to be shipped; (e) machinists who repaired and kept in order machinery in the shops and cut forms for galvanized and wrought iron work; (f) the engineer who operated the machinery; (g) office help; (h) the watchman who watched the premises and kept a fire under the boilers at night; (i) the butler whose duties are not defined, but they were performed on the premises. It is the contention of plaintiff that the wages of all said

employees except those who worked in the office at cler-
ical duties, or officials, should have been included in
the roll of compensation ·paid to employees on which
the premiums on the policies declared on in the first
and fourth counts were estimated; whereas, as said.
above, it is the contention of defendants that the wages
of no employees except such as worked directly on gal-
vanized iron cornices and wrought iron work and of
drivers, should be included.    For the second year, from
June 19, 1903, to June 19, 1904 besides the items already
enumerated, certain work was done in the shops on a
contract for the Union Electric Light & Power Company
of St. Louis.    All the work done by defendants under
said contract, whether it was done in the shops or on
the building of the Power Company (i. e., whether it
was "inside" or "outside" work, according to the phrase
used by the parties) was carried as a separate account
on defendants' books.    The two policies declared on
in the second and fifth counts, that is to say, the poli-
cies which insured defendants from liability on account
of injuries to their employees in the States enumerated,
and those declared on in the third and sixth counts cov-
ering injuries to non-employees,' contained in the sched-
ule under the head of "Kind of Work," the following
language:    "Galvanized iron and sheet iron workers,
wrought iron work, erecting."    It is the contention of
defendants that in making up the total compensation
to employees as a basis of premiums due on said policies,
the wages of no employees should be included except
such as did galvanized, sheet iron or wrought iron work,
or erecting work in the States named. These would come
under what is called "outside work."    Plaintiff, on the
contrary, would include the wages of employees of ev-
ery kind who did outside work within the territory
named; also all those doing outside work on the Union
Electric Light & Power Company's contract and cer-

tain work done during the two years from June, 1902, to June, 1904, on a job in Durango, Mexico.

The cause was referred to a referee who reported on the law and the facts, recommending a finding for plaintiff on each count of its petition and also on defendants' counterclaim.    The total finding recommended for plaintiff was $1,815.44, with interest from March, 1905, or in all $2,011.05.    Exceptions were filed to the report of the referee, but it was approved by the court in all respects and judgment entered in accordance with it.    From said judgment defendants appealed to this court.

The referee and court below found the total inside or shop wages, except for office help, paid during the first year the insurance was in force, was $51,863.17, and that this sum included the wages paid for galvanized iron cornice and wrought iron work inside and the work of carpenters, shippers, machinists, engineer, night watchman and butler; that the total inside or shop wages paid during the second year for said kinds of work, and also inside work on the Union Electric Light & Power Company contract (which constituted a separate and special account on defendants' books) was $53,436.-15; that the total of shop wages for the period of the third year the insurance was in force (i. e., from June 19, 1904, to September 24th, when the policies were cancelled) was $12,431.30, including wages for inside work on the Electric Light & Power Company's job.    The referee found the wages paid for outside work during the first year (except for work at Durango, Mexico, about which there is no contention on the appeal) amounted to $11,869.75; distributed as follows; for tinners' work outside, $8,915.02, and for wrought iron work, outside, $2,954.73.    For the second year he found the outside wages to be $20,660.63; distributed as follows: tinners' work, outside, $11,406.39, wrought iron work, outside, $1,591.88, and Union Electric Light & Power Company

work, outside, $7,662.36.     For the portion of the third
year while insurance was in force, he found the wages
for outside work to be $3,744.62; distributed as fol-
lows: tinners' work, outside, $2,722.52, wrought iron
work, outside, $634.20 and the Union Electric Light &
Power Company work, outside, $387.90.     As throwing
light on the interpretation of the policies by the parties,
with respect of what employees were covered by them,
evidence was introduced relating to certain accidents.
Defendants reported an accident on December 22, 1902,
to E. F. Barker, an employee in the shop.     He was re-
ported as having been injured while employed as a
"Brake and Press Hand."     Employees of that kind
worked in making galvanized iron cornices, but Barker's
name appeared on defendants' pay-roll as a tinner.     An
employee by the name of Schell was reported as injured
March 26, 1903, while working at a job in East St.
Louis, as a wrought iron worker but he was on the
pay-roll under the head of "Union Electric Light &
Power Company, outside," and was engaged on work
done for that company.     On March 14, 1904, an em-
ployee by the name of Billman was reported as having
been injured while working as a laborer.     He was on
the pay-roll as a shipper and was engaged in that work
when hurt.     The same was true of another employee by
the name of Arnold.     The referee found these notices of
injuries were sent to the company for the purpose of
having it attend to any claims that might arise, and that
in each case the parties treated the accident as coming
within the risk assumed by plaintiff under its policies.
To break the force of these instances as a construction
of the contract by the parties, defendants contend the
evidence shows the injured employees worked in dif-
ferent capacities, some of which fell within the exact
words of the policy which designated the risk insured
against. The referee also found that in the statement of
compensation made out by defendant on which plaintiff

claimed more premium on the three policies for the first year, the defendants themselves included the wages paid for galvanized iron cornice and wrought iron work, both inside and outside, the night watchman and part of wages paid tinners, but excluded wages paid for skylight work, machinists, engineers, the butler, part of the wages to tinners, carpenters, shippers, work at Durango, executive officers and office help. The official who compiled the list explained the including of part of the wages paid tinners, by saying the expense of tin work was not then kept separate on defendants' books from the expense of galvanized iron cornice work.

1. We hold the defense of accord and satisfaction was not established. No controversy had arisen between the parties as to the amount of premiums due on policies for the first three years. What happened was simply this: the insurance company demanded of the defendants a statement of the wages paid to employees during the year covered by the policies. This statement was furnished by defendants and showed the full premium due according to the terms of the policies had not been paid. Plaintiff made out a bill for the excess of premium and defendants paid it without a word. Plaintiff claims there is a balance still owing and that the statement of wages paid, which the defendants furnished, was deficient in that it excluded wages which ought to have been included. If this was true, the defendants have only paid part of a debt they owed plaintiff; which, of course, is no satisfaction of the entire debt. [Winter v. Cable Co., 73 Mo. App. 173; Wetmore v. Crouch, 150 Mo. 671, 51 S. W. 738.] If there had been a controversy in good faith at the time the second payment on the premium was made, and if the payment had been tendered in full of plaintiff's demand, and plaintiff had accepted it, an accord and satisfaction would have arisen; because a payment under the circumstances would have been a compromise

of a disputed claim and, therefore, supported by a sufficient consideration.    [McCormack v. St. Louis, 166 Mo. 315, 65 S. W. 1038.]

2.  We have already said that defendants contend the wages of the following employees should not enter into the basis on which the insurance premiums were to be computed; skylight workers, tinners, carpenters, shippers, machinists, engineers, night watchman and the butler.    As to all those employees, except the skylight workers, defendants' counsel argues that they plainly are not embraced within the classes of workmen designated in either of the schedules, one of which describes "galvanized iron cornice and wrought iron work, including drivers," and the other two "galvanized and sheet iron workers, wrought iron work, erecting." It is said to be obvious that neither tinners, carpenters, machinists, shippers, engineer or butler, fall within those descriptions.  Skylights were manufactured in the shops out of galvanized iron and glass, but the referee found that during the pendency of the policies they were made in the building and sold to customers, but not put into place on buildings; that is, no outside work was done on them.    Defendants' counsel argues regarding the skylight workers, that they were not within the schedules of the policies insuring against outside accidents, because they worked exclusively in the shops and were not within the policies insuring against inside accidents, because, though they worked in the shops, those policies only covered galvanized iron cornices, wrought iron work and drivers; thereby excluding workers who made galvanized iron skylights.  The general trend of the argument for defendants is that they were not protected against loss from injuries to any of the eight classes of employees we have named, to-wit: skylight workers, tinners, carpenters, machinists, shippers, engineer, watchman and butler; and were not protected from injuries to non-

employees occurring in the course of the work done by any of the employees just enumerated; that the true construction to be put on the policies in seeking a basis for premiums is that no wages except of such employees as were included within the indemnity to defendants, should be taken account of in fixing the premiums on the two kinds of policies (inside and outside) issued to protect against loss in consequence of injuries to employees, and that no wages should be taken into account in ascertaining the premiums to be paid on policies insuring against loss in consequence of injuries to non-employees, except the wages of such employees as were engaged in the very kinds of work described in the schedule of said policies, to-wit: "galvanized and sheet iron workers, wrought iron work, erecting." It would not follow, necessarily, that the basis for the premiums on the policies insuring defendants against liability for injuries to employees, should consist exclusively of the wages paid only to those employees who were within the indemnity, and, of course, such wages could not be the basis for premiums on policies indemnifying against loss for accident to non-employees. As regards the basis of premiums on insurance of the first class (against loss in consequence of injuries to employees) peradventure the policies might yield the interpretation that the wages of all hands engaged in the respective kinds of work (inside and outside) should be embraced in the premium basis, even though all were not within the indemnity. But aside from this, it is our opinion that when fairly interpreted, one set of policies indemnified the defendants against loss in consequence of injuries to any and all employees in the shops, except officials and the clerical force, and that another set indemnified against loss in consequence of injuries to all employees engaged in outside work, with the same exceptions. Possibly the butler's wages ought to be excepted, but his duties are

not disclosed.  We think the premiums on the shop poli-
cies were meant to be based on the wages paid all the
workmen in the shops, and the premiums on outside pol-
icies on all wages paid men employed outside; except,
of course, the executive and clerical men.  In interpret-
ing the former (shop) policies, it is appropriate to con-
sider what, in reason, was the purpose of defendants in
taking out insurance.  The rosters of wages paid the
different employees which the referee accepted, showed
that the wages of other than cornice and wrought iron
workers, to-wit: tinners, skylight workers, shippers, ma-
chinists, and carpenters, constituted a large portion of
the amount of wages paid for inside work.  The wages
of neither of those classes equalled the wages paid for
galvanized iron cornice work, or wrought iron work, in-
side; but nevertheless the total of wages to other employ-
ees was large enough to show that numerous workmen
were employed in the shops besides those who followed
the trades of galvanized cornice and wrought iron work.
It is not shown that the employees who did those two
kinds of work were more exposed to accidents than the
other employees; and it seems unreasonable to suppose
defendants would insure against loss on account of ac-
cidents to cornice and wrought iron workers and driv-
ers, and assume the risk of accidents to other workmen.
For several years there had been a steady decline in the
quantity of cornice work done in the shops and in the
wages paid for that service.  The defendants both swore
they had ceased to do cornice work on St. Louis jobs in
consequence of disputes with trades unions.  Their testi-
mony on this point seems unequivocal, but the referee
merely found  they  had  ceased  to  erect  cornices;
though their cashier swore they did erect them when-
ever they were employed to do so.  The evidence is am-
biguous along this part of the case; but any version of
it shows the cornice work of defendants had greatly
diminished before the policies in suit were written, and

it is hard to see why defendants should especially need insurance for cornice workers more than for tinners, shippers, etc. For years defendants had advertised their business on bill boards and letter heads, in the city directory, and elsewhere, as "Galvanized Iron Cornice Work and Wrought Iron Work;" and while the former work was dwindling in comparison with iron work, the advertisements remained unchanged. Notwithstanding these facts, which look like defendants needed insurance covering several classes of workmen, if the language of the policies mean that no employees except workers on cornices and in wrought iron, were included in the indemnity, the intention of the parties would be determined from their language even though the result was unreasonable. But in our opinion the referee and the court below were right in holding that the words "galvanized iron cornice and wrought iron work" under the caption: "Trade or Kind of Work," were used to describe, in a general way, the business carried on in the shops and not to specify the classes of workers within the indemnity of the policy. The tasks of the other employees contributed and, indeed, were essential, to the manufacture of cornices and of wrought iron work. Shippers had to receive, pack and unpack material, the engineer had to run the engine, machinists had to cut forms and dies and repair the machinery, and part of the work of tinners was in galvanized iron. Moreover, the constructtion put on the contract by the defendants in preferring claims for injuries to other classes of employees, and by plaintiff company in paying for those injuries, indicate that both parties understood the contract was an indemnity on account of loss in consequence of injuries to all the employees in the shops, and so the referee found. It is true explanatory evidence was offered by defendants in an attempt to break the force of those circumstances; but the testimony, as a whole, well supported the conclusion of the referee, which we accept.

Having pointed out the conditions under which defendants took the insurance and what risks they deemed covered by it, we will inquire more closely what the language of the policies imported concerning the risks insured against. The defendants were insured by the shop policies against liability for damages on account of accidental bodily injuries suffered by any employee while on duty in the shops mentioned in the schedule, "in and during the operation of the trade or business described in said schedule." Those words consist well with the view that by galvanized and wrought iron work, was meant a description of the business and not of the classes of employees covered by the insurance. In another paragraph of the policy the insurance was said not to cover injuries to or caused by any person whose wages were not included in the estimated wages set forth in the schedule, or one not on duty at the time of the accident in an occupation therein described. There is nothing in that language which is necessarily repugnant to the view that all the employees were included in the insurance. As we have said all the men who worked in the shop were necessary to the prosecution of the work carried on therein, in galvanized iron cornices and wrought iron with the possible exception of the butler. Certain language of the schedule, taken in connection with the grouping of the wages therein, indicates that the words in question, "Galvanized iron cornices and wrought iron workers, including drivers" were not intended as a classification of the employees covered by the insurance, but as a description of the business done in the shops. A printed direction in the policy immediately above those words, described the mode of filling out the blanks below, and said that each manual classification should be entered separately when the pay-roll was divided under the manual rule; and that the number of employees, *premium rate and amount of premium* should be given *opposite each classification.* The words "galvanized

iron and wrought iron workers, including drivers," could not have been intended by the parties to specify the classes of employees; for the direction contained in the language we have italicised was not followed. The intention was to have the classes of workmen separately specified when the insurance took into account their different trades or tasks in fixing the rates of premium for the different tasks. Nothing of that kind could have been intended in the present instance; for it will be observed that instead of stating separately the number of cornice workers and the number of wrought iron workers, they were grouped together, as 14,500 employees. If the intention had been to insure only cornice workers and wrought iron workers and to divide the employees into classes, according to their respective trades, the two trades should have been separated in the schedule. It is true the number of drivers is given; but as drivers were sometimes in the shops and exposed to risks there, and sometimes outside, both the body of the policy and the schedule had a special provision for them. It says drivers and their helpers while on duty at other places than the shops, would not be included in the insurance given by the shop policies, unless they were enumerated in the schedule. This circumstance strengthens the conclusion that all other employees except drivers and helpers, were included in the insurance. There is the further fact that the policies specially exempted certain employees from the risks insured against, which argues that all other employees in the shops who were engaged in the work described in the schedule, fell within the risk. The exceptions are officials and office help, mechanics engaged in making additions to or repairing the shops, and children under fourteen years of age or employed contrary to law. But employees whose wages went into the pay-roll on which the insurance was based, were declared to be within the risk while making ordinary repairs. The

terms of the policies are, on the whole indefinite; but taking into consideration all their provisions, the situation of the parties when the insurance was written, and such of their acts as throw light on their intention, we think the proper construction to give it the one above set forth.

That the acts of parties done pursuant to a contract between them, and showing their understanding of its terms, may be resorted to in order to ascertain the meaning of the contract if its provisions are obscure, is a rule of interpretation that has been applied to contracts like the one in hand to determine what employees were within the risk.   [Fuller Bros. v. Fidelity Cas. Co., 94 Mo. App. 490, 68 S. W. 222.]   How the conditions existing when the insurance was written aid in determining the extent of the risk covered, is illustrated by the case of Travellers Ins. Co. v. Lumber Co., 83 Fed. 977.   The lumber company's policy insured it against loss on account of accidental injury to any person to whom the company would be liable for injury at common law or by statute; and in the application for the policy it was stated to be understood that said company might, in the conduct of its business, use a railroad owned by itself and "used only for its own lumbering purposes."   The company took two commercial travellers as passengers on a train and collected fares from them.   These travellers were going to the company's store to sell goods.   They were hurt while in transit and the lumber company became liable for damages.   It sued on the policy for indemnity, and the question was whether or not the company was using its railroad for lumbering purposes only when it carried the two passengers for hire.   The court said:

"The company constructed and operated upon its own land, and primarily for use in its business, a railway, by the use of which logs were transported to the mills, and manufactured lumber from the mills to the

Grand Trunk Railway, at a point three and a half miles distant. Over the same railroad, needed supplies for operations, and stock or merchandise for the shop above mentioned, were transported, as there was occasion for so doing. The company's agents and workmen, and persons having business at the mills, or with the shop, including insurance agents and commercial runners and others, also were carried, from time to time, over said railroad, both ways. From some of the persons so carried over its railroad, the company demanded and collected pay for the transportation. We are of the opinion that the transportation upon the company's private railroad of two commercial travelers, who had come to the premises of the lumber company to transact business with the company, and to make sales, and to take orders for supplying the shop of the lumber company, was a use of the railroad within the scope of the company's 'own lumbering purposes.' The fact that the travelers paid a sum of money for a special conveyance is immaterial, since the railroad was used by them and by the lumber company in direct connection with the business of the company."

In Hover v. Assurance Corp., 93 Wis. 201, the policy insured against liability for personal injury to any employee in the service of the West Superior Iron and Steel Company "while engaged in the employer's work in any of the occupations or at any of the places mentioned in the schedule." The schedule under the heading "Description of The Occupation of Employees" said "All operations connected with the business of iron and steel works" at "West Superior and elsewhere in Wisconsin in the service of the employer." The plaintiff was a regular employee in the steel works and was injured while at work in the manufacturing department. The company was building an addition to its shops and a crew, other than the one plaintiff was connected with, was constructing the addition. While said crew was

raising a girder, it fell and hurt the plaintiff.    The insurance company refused to indemnify on the ground that the operation by which plaintiff was injured was not covered by the policy.    Plaintiff sued the West Superior Company and garnished the insurance company.    The court said that if the labor of constructing the addition to the shop was not an operation connected with the business of iron and steel work, the insurance company was not liable; but held that the operation was so connected and, after reviewing a Massachusetts case, said:

"The general language of the contract, *'All operations connected with the business of iron and steel works,'* is not restricted by anything in the conditions indorsed on the policy or any paper referred to or made a part of it.    If the intention was to restrict such language to operations in any particular department, or to any particular branch of the business, or to any particular instrumentalities used in such business, it was easy to have said so in unmistakable language.    The court should give the general language the assurer saw fit to use, under the circumstances, a broad and liberal construction in favor of the objects for which the policy was taken out, and by so doing the conclusion is easily reached that it covers the operation of constructing a building for the use of the assured in its business, as one of the operations connected with such business."

The foregoing cases are only in point by analogy and we have found none directly in point.    Hence we have had to resort to the general rules of interpretation.

3.    The policies providing for outside insurance are even more ambiguous than those insuring against inside risks, because, instead of the use of the word "work" in the memorandum under the heading "Trade or Kind of Business" said memorandum reads:    "Galvanized and sheet iron workers, wrought iron work,

erecting," under the heading "Kind of Work." Those captions are less readily construed as descriptions of business than the former captions. But the bases for premiums on outside policies may be otherwise determined. By referring to the wages found by the referee to have been paid for outside work during the three years covered by the policies, it will be observed that for the first year those wages were composed exclusively of the two items; tinners' work, outside, and wrought iron work, outside. The first item, or the one for tinners' wages, outside, is $8,915.02, and the second item for wages for wrought iron work, outside, is $2,954.73; or a total of $11,869.75. For the ensuing two years there was an additional item for wages for outside work done on the Union Electric Light & Power Company's job. Of those items there can be no question that the wages paid for wrought iron work should be included in the basis of premiums, for they fall within the express words of the schedule. Neither is there any dispute regarding the outside work on the Union Electric Company's job. What we have to determine then is whether wages for tinners' work done outside, would fall within the terms of the policy. It was the testimony of both the defendants that part of the work of tinners outside was on galvanized iron; and defendants' cashier swore that during part of the period covered by the insurance, the wages of tinners and galvanized iron workers were not kept separate on defendant's pay-roll, but were carried under the one head. It was further testified that tinners working outside covered fire proof doors and shutters with tin or sheet iron, which consisted of iron sheets covered with tin. It was in testimony, too, that tinners put up galvanized iron gutters and down spouts and sheet metal gutters. They also put in heating and ventilating pipes, which were sometimes made of galvanized iron. It thus appears by defendants' own testimony, that tinners working outside, as well

as inside, worked in galvanized and sheet iron and therefore came within the words of the schedule.

4. By the interpretation we have given, and which the referee gave, to the provisions of the policies relating to the bases on which premiums should be computed, defendants owed plaintiff more for premiums than they paid for the first two years of the insurance, and the policies in force for a part of the third year earned more premiums while in force than were collected. Hence the finding on the counterclaim for excess of premiums paid on said last policies was adverse to defendants.

5. Though we think the learned referee and the court below were right in including tinners' wages for outside work in the basis on which the premiums for outside policies were to be computed, we have been unable to find any evidence in the record which justified the fixing of tinners' wages for work outside from June 19, 1902, to June 19, 1903, at $8,915.02, or during the ensuing two years at the amounts found for each year. The referee adopted as true the pay-rolls furnished by the defendants, and in said rolls the items of wages for tinners' work, specify said wages as having been paid for both inside and outside tinners' work; whereas the referee and the court below classed the items as those of wages paid exclusively for outside work. In truth there is no testimony in the record by which a division can be made of the portions of those items paid for inside tinners' work and outside work. It appears that the workmen who did tinners' work outside in erecting or hanging doors and shutters, also did inside work in covering the doors and shutters with tin. The importance to defendants of a just apportionment of these wages appears from the fact that the rate of premium for inside insurance was 67½ cents for each $100 of wages paid, while for total outside insurance it was $5.50 for each

128 App.—14

$100 of wages paid. It is therefore evident an exorbitant amount might be awarded against defendants by including inside tinners' wages as outside. Counsel for plaintiff, in seeking to support this finding of the referee, point to that portion of the testimony of Mr. Piper, the auditor of plaintiff company, wherein he swore that in making out the pay-roll on which plaintiff based its claim for further premiums, he co-operated with Mr. Stevens, defendants' cashier, and that Stevens gave him information which enabled him to separate the wages of the inside from the wages of the outside workers. But the referee did not adopt Mr. Piper's statement of wages, but as said, adopted that of defendants, which varied widely from Piper's. Moreover, the pay-roll as audited by Piper, did not separate the wages of tinners doing outside work from the wages of outside wrought iron workers. Repeated perusals of the record have not disclosed any evidence to support a finding that the total sum of wages stated in defendants' pay-roll to have been paid to tinners for "inside and outside work" was paid for outside work alone. This matter will have to be investigated further, because it is very material to have it right, as otherwise defendants may be seriously wronged. Therefore the judgment will be reversed and the cause remanded. It is so ordered. All concur.