Fleischmann *vs.* Gottschalk.

(Decided 27th March, 1889.)

---

ERNEST FLEISCHMANN *vs.* ALBERT GOTTSCHALK.

*Partnership—Presumption.*

In the absence of all precise stipulations between partners, as to their respective shares in profits and losses, and of all other controlling evidence and circumstances, the rule of the common law is that they are to share equally. But this presumption is not an

irresistible one. It is a question of intention; and is to be determined by a consideration of all the facts and circumstances.

A person engaged in a large and lucrative business, with sufficient capital, and having four children, agreed with A. upon the marriage of the latter with one of his daughters, to take him into partnership with him. There was no agreement for duties, for service, for contribution to capital, or in respect to the share A. was to receive of the profits of the concern. More than a year afterwards, in August, 1886, A. was told by his father-in-law that he had directed him to be credited with seven and a half per centum of the profits of the concern, beginning with the 1st of July, 1885; stating that for the first six months the profits had been $50,000. On a bill filed by A. against his father-in-law for an account of the partnership, and for the payment of his share of the profits, he claiming an equal share with the defendant, it was, upon consideration of all the facts, and the conduct of the parties, HELD:

That the plaintiff was entitled to seven and a half per centum of the profits.

APPEAL from the Circuit Court of Baltimore City.

The bill in this case was filed by the appellant against the appellee for an account of an alleged partnership between them, and for the payment of his share of the profits, which he claimed to be one-half. The case is stated in the opinion of the Court. The decree from which the appeal was taken, was passed by Judge STEWART.

The cause was argued before ALVEY, C. J., STONE; ROBINSON, IRVING, BRYAN, and McSHERRY, J.

*Thomas W. Hall*, and *Charles Marshall*, for the appellant.

In the absence of any agreement between partners as to the proportion in which they shall share or divide profits, their shares are *prima facie* equal. 1 *Lindley on Partnership, marg. page* 348, 349; *Story on Partnership,* (*7th Ed.,*) *sec.* 24 *and notes;* 1 *Bates on Partner-*

Fleischmann *vs.* Gottschalk.

*ship, sec.* 181 *and notes;* 1 *Taylor on Evidence, (American reprint from* 8*th Eng. Ed.,) sec.* 184.

In the case of a partnership between persons already united by ties of blood or relationship, it has been held that, in the absence of agreement, the reasonable and just presumption would be that the parties meant to treat upon a footing of equality, or to waive the inequality, as a matter of liberality, or bounty, or parental or filial affection, or proximity of blood, or personal friendship. The proper administration of justice requires that in the absence of agreement, there must be some general rule of interpretation of the intention of parties as to the apportionment of profits. And what rule can that be except the rule of equality? Says Lord ELDON in the leading case of *Peacock vs. Peacock*, 16 *Ves., Jr.*, 49, 56:

"The father employed his son in his business, and as is frequently done by a father, meaning to introduce his son, the business was carried on in the name of 'Peacock & Co.' It appeared to me that the son, insisting that he had a beneficial interest, must be entitled *to an equal moiety, or to nothing;* that as no distinct share was ascertained by force of any express contract between them, *they must of necessity be equal partners, if partners in anything.*" And the reference of such a case to a jury, and the verdict of the jury thereupon, the learned Chancellor pronounces to be "extraordinary." "The proposition being that the son was interested in some share not exceeding a moiety, the jury in some way, upon the footing of *quantum meruit*, held him entitled to a quarter. I have no conception how that principle can be applied to a partnership."

The same view was taken by Baron PARKE in *Farrar vs. Beswick*, 1 *Moo. & R.*, 527; and by Vice-Chancellor WIGRAM in *Webster vs. Bray*, 7 *Hare*, 159, 177; and

by Lord COTTINGHAM in *Stewart vs. Forbes,* 1 *Hall & Twells,* 461, 472; *S. C.,* 1 *Macn. & G.,* 137; and by Lord Justices KNIGHT BRUCE and Sir G. J. TURNER, in *Robinson vs. Anderson,* 20 *Beav.,* 98; *S. C.,* 7 *De G., Mac. & G.,* 239. And the same principle has been recognized in this country since the earliest cases of *Gould vs. Gould,* 6 *Wend.,* 263; *Harrison vs. Sterry,* 5 *Cranch,* 289.

Later cases might be multiplied without number. They will be found cited in the notes to Lindley, Bates and Story, at the places to which reference has been given. The general principle seems to have been fully recognized by this Court in *Welsh vs. Canfield,* 60 *Md.,* 469, 473, and *Smith vs. Ullman,* 58 *Md.,* 183, 191—in which latter case, after stating that when the contract is silent as to the proportions in which profits are to be divided, the legal presumption is that they are to be shared equally, reference is made among other authorities to *Peacock vs. Peacock,* 16 *Sumner's Vesey,* 49, *and notes; Story on Partnership,* sec. 24.

*Isidor Rayner,* and *Wm. Pinkney Whyte, Attorney-General,* for the appellee.

The ultimate test as to partnership *inter se,* as well as to third persons, is that, unless he has some ownership in or of the profits, as they accrue, and are not yet ascertained or divided into portions, he is not a partner. *Parsons on Part., note to page* \*58.

The views of Chancellor KENT, that "there is a just and marked distinction between partnerships, as respects the public, and partnerships, as respects the parties, and a person may be held liable, as a partner, to third persons, although the agreement does not create a partnership between the parties—actual intention, is required to constitute a partnership *inter sese*"— has been adopted by this Court in *Kerr vs. Potter,* 6

*Gill,* 423. And in *Bull vs. Schuberth,* 2 *Md.,* 55, the Court says: "The fact of the existence and non-existence of a partnership, as between the parties themselves, must be gathered from the intention of the parties, and the Court, in .arriving at the intention, must form their conclusions from deductions drawn by analogy from principles of law, applied to facts and circumstances, developed in the case." *Heise vs. Barth,* 40 *Md.,* 267.

It is often very difficult to decide whether two or more persons are partners as to each other. The rule is, that it is a matter to be determined by the intention of the parties, as the same is expressed in the contract, or gathered from their acts and all the cirstances which are available for the interpretation of the contract. *Parsons on Part.,* 38; *Kerr vs. Potter,* 6 *Gill,* 404; *Bull vs. Schuberth,* 2 *Md.,* 38; *Sangston vs. Hack,* 52 *Md.,* 192.

Where a percentage of profits is adopted simply as a mode of measuring the amount of wages, salary or remuneration, the fact that it is made contingent upon profits, does not create a partnership. *Bull vs. Schuberth,* 2 *Md.,* 56; *Crawford vs. Austin,* 34 *Md.,* 49.

The receipt by an employé of the firm, of a portion of the net profits of the business, as a compensation for services, &c., does not make him a partner. *Whitney vs. Leakin,* 66 *Md.,* 255.

The intention of the parties must determine the question of partnership. Where no express contract, then from acts and declarations of the parties, who must be supposed to intend what their words and acts reasonably indicate. *Mills vs. Simmonds,* 51 *How. Pr.,* (*N. Y.,*) 48; *Denny vs. Cabot,* 6 *Metcalf,* 82.

The words, which the parties use, and all of them, and all the parts and provisions of their agreement, as well as its general character, and their relation to each

other are to be looked at, and if the whole evidence leads to the conclusion that the receiver of the money took it only as wages, or *specific compensation* or payment, and did not intend to acquire any interest in, or any control over, the business,. or in the profits as they accrue, and before they are ascertained and divided, but only after they were ascertained, to find in them the fund, and in the amount the measure of his payment, he *is no partner*, nor liable as such. *Parsons on Partnership*, 71.

In view of these decisions, the conduct of the plaintiff in the establishment of Gottschalk & Co., his treatment by the clerks, his statement that he was denied the right to see the books of the concern by the bookkeeper without remonstrance, or assertion of his rights, his appealing letter to be *permitted* again to sign the name Gottschalk & Co., all prove that he was not a partner with equal rights with Gottschalk, the defendant.

IRVING, J., delivered the opinion of the Court.

The decree of the Circuit Court of Baltimore City, from which this appeal was taken, establishes a partnership between the appellant and the appellee from the 1st day of July, 1885, to the 15th of May, 1887, and directs the auditor to state an account of the partnership business, and to allow the appellant seven and one-half *per centum* of the net earnings of the firm as his share thereof, and no more. The appellant who was plaintiff below, appeals from so much of the decree as limits his share of the earnings of the business to *seven and one-half per centum*. The appellee has not appealed from the decree establishing the partnership, which was denied in the pleadings and evidence of the appellee ; therefore the only question open in this Court is whether the Circuit Court properly fixed the appel-

lant's share of the earnings of the business. It is a narrow question, to be settled by the facts and circumstances bearing upon it; for confessedly there was no written agreement or stipulation about the partnership. It was one, if existing at all, existing at will; and the terms of it can only be inferred from the statements and conduct of the parties in relation to the business.

The appellant contends that, under the circumstances, the law presumes his interest was a moiety of the profits, and this he claims was erroneously denied him. There is little room for doubt as to what the law is in case there is no specific agreement as to interest, and there are no facts and circumstances enabling the Court to see what was the expectation and intention of the parties, and from which a contract as to shares can be inferred. The authorities are practically harmonious on that subject. In section 24 page 33 of *Story on Partnership*, (*Gray's Edition*) the law is thus stated: "In the absence of all precise stipulations between the partners as to their respective shares in profits and losses, and in the absence of all other controlling evidence and circumstances, the rule of the common law is that they are to share equally." But this presumption is not an irresistible one. If the circumstances in any particular case show that the partners did not so intend, and must be fairly supposed to have intended the contrary, the presumption of law must yield to the presumption of fact. *Ib.*, 34 and 35, and *notes*, where all the authorities are collected. It is a question of intention, and is to be determined by a consideration of all the facts and circumstances available for the construction of the contract. *Parsons on Contracts*, page 58.

The Court below in its opinion says: "The Court has no doubt, from the evidence, that when the plain-

tiff became a member of the firm, it was the understanding that the defendant should fix his interest in the profits. The pretence set up, that he expected one-half of the profits, is not tenable; nor do the words '*full partner*,' upon which so much stress has been laid by the plaintiff's witnesses, justify the conclusion that his interest was to be one-half. The defendant was sole proprietor of a large business of established standing, involving an outlay of probably fifty thousand dollars a year in its conduct; and his family consisted of two sons and another daughter, besides the one who had married the plaintiff, so that such an expectation as the plaintiff sets forth is, on its face, unreasonable. There is no question that when the rate was fixed by the defendant, it was readily agreed to by the plaintiff, and never having been changed by mutual consent, it remains the standard by which the interest of the plaintiff is to be ascertained."

We think the facts and circumstances, and preponderance of proof in the cause fully justified these conclusions of the Circuit Court, and the decree which was passed to carry them out.

The only direct testimony bearing upon the question are the statements of the appellant, the appellee, Jacob Gottschalk and Mr. Becker, the chief bookkeeper of the firm; and their testimony, to our mind, puts it beyond doubt that the appellant never expected one-half of the profits of the firm, and ought not to be allowed any more than the Circuit Court has awarded him. He was an Austrian, and had been in this country but a few months when he married the appellee's daughter. He was employed as a travelling salesman for a bent wood furniture establishment in his own country, and he courted and married the appellee's daughter with the plain design of improving his financial condition, and had he not "hasted to be rich" by un-

warranted demands of his benefactor, he would undoubt-
edly have fared better.    By his own sworn statements
as a witness it seems he never had but "two short con-
versations" with the appellee on the subject of the
partnership which has been decreed to exist.    The first
was on the 15th day of February, 1885, the day after
his engagement to the appellee's daughter, when, he
says, the appellee *intimated* to him that after his mar-
riage he would take him into partnership with him;
and the other two days after his marriage, in April,
1885, when he told him his interest in the firm should
begin the first day of July following.    That this was
a simple gratuity on the part of the father-in-law is
plain from the fact that there was no agreement
for duties, for service, for contribution to capital,
or in respect to the share of profits of the concern
he was to receive.    The appellee was a man of suffi-
cient capital, in a large and flourishing business, thor-
oughly established, and so far as appears needing no
help; but was only seeking to provide for his daugh-
ter's husband, with whom, at that time, he seemed
reasonably pleased.    It is inconceivable that this
young man could have expected Mr. Gottschalk to
give him, at once, without bringing a cent of cap-
ital to the firm, or any trade to the house, and
without any experience in the business, in the start
and without trial, one-half of the profits of the
firm, and reserve only the other half for himself and his
three other children.    Still, in law, we would not be
justified in relying solely on these circumstances in
concluding that he was accepting the gift of an inter-
est in the firm of only such share as the father-in-law
saw fit to give him; but the *evidence* convinces us such
was the fact.    The appellee gave him the means for a
three months' bridal trip to Europe, and upon his
return he went to the home of his father-in-law with

his wife, and was installed in the store where he did some correspondence for the house; but it is proven that the employés did not regard him as a partner, but only as a clerk; so that it is clear he did not *assert* his rights as a partner or demean himself as one. No change was made in the concern; no notice of new partnership was given; and no new arrangement with the employés, yet he was introduced at the Banks as a son-in-law and partner of Mr. Gottschalk, and did sign the firm name to checks and other papers, without appending letters indicating it was by *power of attorney*, as was the habit of the *employés* having such authority. He says he expected one-half the profits until in August, 1886, when Mr. Gottschalk told him he had directed him to be credited with seven and one-half *per centum* thereof, beginning with July 1st, 1885; stating that for the first six months the profits had been $50,000. He says he told Mr. Gottschalk that was below his expectations, (which Mr. Gottschalk denies) but he admits that he did not tell Mr. Gottschalk that he *claimed* anything or expected half, notwithstanding what was accorded him was less than a sixth of what he now claims was his due. He says Mr. Gottschalk tried to prove to him that this was a fair share and liberal offer, and that he admitted " it seemingly was liberal;" but the large profits were attributable to a lucky turn in whiskey, but for which, at that rate, his share would have been but a pittance. If he was to have half under any circumstances, no matter what they were; if he was not subject to Mr. Gottschalk's will; could he have admitted, and would he have admitted, that under the fortunate circumstances of the first half year the allowance given was a liberal one! Impossible! No sane man, having such *right* as he claims, could have failed to assert it at such time, and instead of doing so, could have admitted it

was *liberal* to offer him only one-seventh, (for it was
little more) of his rightful portion.   Shortly after this
he says Mr. Gottschalk wanted him to stop signing the
firm's name to anything but checks, but he declined,
and wanted the books closed that he might withdraw ;
but that on the persuasion of Mr. Gottschalk, and the
assurance he was going to buy a brewery and give him
a half interest in it, he staid until another rupture ;
when written articles were prepared denying him the
right altogether of signing the firm name, and giving
him 7½ *per cent. for the time then past and ten per cent. for
the time to come* in the profits, which he declined to sign
and left the concern.   All this shows he was entirely
at the *will* of his father-in-law as to interest in the
profits, and if the books had been closed as he sug-
gested, and he made no specific demand different from
that placed to his credit, it is clear the books would
have been closed on that basis.   He did not, however,
withdraw, but remained, with the knowledge that the
books gave him only *seven and one-half per centum* of the
profits, and without demanding that they should be
corrected, and a different allowance be made.   The
failure to assert different rights, and to insist that the
books of the firm should be made to conform to what
he esteemed to be his right as a partner, was a clear
acquiescence up to that time, in the allowance made
him.   When Mr. Becker, the book-keeper, told him of
the allowance, as he testifies he did, the only reply he
then made was that Mr. Gottschalk had already "told
him of it."   Subsequently he said " he was going to
have a further talk" with his father-in-law, but he
asserted no other right or claim.   Mr. Becker says that
still further on, he did protest against that allowance,
but then asserted no claim to any specific allowance.
This was when Mr. Becker showed him his account and
how he stood with relation to it through his drafts

from the store and on it. It is true, he says he demanded of Mr. Gottschalk by what right he forebade his using the firm's name, and restricted him to drawing only $250.00 per month on account of his share as a partner, all which Mr. Gottschalk denies; but if he was entitled to equal rights with his father-in-law and had felt he was entitled to *half* the profits, he would have demanded, as he ought to have demanded, his rights, and insisted upon the books being made to conform to them; for the entries in the books "are as conclusive of the rights of the parties as if they had been found prescribed in a regular contract." This is what the Lord Chancellor lays down as the law in *Stewart vs. Forbes*, 1 *McN. & G.*, 137.

More than six months after the interview in August, 1886, with Mr. Gottschalk, viz., on 21st of March, 1887, the appellant wrote his father-in-law a letter, in which he says, (after writing of another matter,) "I also beg you to again arrange about my signature at the store. It is nothing as a matter of form, and I positively promise you that I shall not put my signature to any note. I have done so for the last nine months, ever since I found out that you did not approve it. In fact, I have for the last few months only signed about a half dozen checks, as I always, as you well know, stand back for Joe in everyway signing checks, and also in all other ways; but I would not like to be under Mr. Becker; all the clerks in the office know that I cannot sign any more, and even outsiders seem to be informed about it; naturally, that worries me a good deal, and does not do the business any good. By giving me the right to sign again, as before, you would show to people also that there is no more ill-feeling between us, while any arrangement that you are about making, as you recently informed me, would not be affected in the least. Very truly," &c. This letter contains the most

convincing proof that his *only complaint,* at *that* time, was that he was denied the right to sign the firm name as in the beginning of their relations. There is not a word of remonstrance against the allowance of only *seven and one-half per cent.* of the profits of the concern, nor a suggestion that he ought to have more. There is not a word of complaint that he was disallowed to draw from the store more than $250.00 per month, by the direction of Mr. Gottschalk, of which he was informed by Mr. Becker when he showed him his account, and compared the allowance with his receipts. He pleads but for *one thing,* and that *is restoration to the right to sign the firm name* as formerly, the refusal of right to do which *mortified him.* It is plain that he knew and felt he was, in the whole matter, subject to the will of his father-in-law, and that Mr. Gottschalk was to fix his share, as he swears he was to do, after he found how the business turned out the first six months. This Mr. Gottschalk says was the understanding when he took him into the store, and the statements and conduct of the appellant convince us it *was* the agreement and understanding of the parties ; and, if it was not, the appellant has so far acquiesced in what was awarded to him on the books of the concern that he cannot be allowed any more. It is proper to add that Jacob Gottschalk, a brother of the appellee, testifies that the appellant told him he was allowed seven and one-half *per centum* of the net profits, and that he seemed satisfied, and did not express any disappointment ; but the case of the appellee is clearly sustained, irrespective of this declaration offered by this witness. It does not appear that the request of this letter of the 21st of March, 1887, was ever granted. On the contrary, it would seem that it was not ; for the paper defining the relation of the appellant to the house, and granting him seven and one-half *per cent.* of its earnings for the

time then past, and ten *per centum* for the time to come, denied him the right to sign the firm name, and in effect reduced him to the position of an employé paid by a *per cent.* of the profits. This was rejected, and the appellant retired entirely from the concern on the 15th of May, 1887. We are all of opinion there was no error in the decision of the Circuit Court, and the decree will be affirmed.

*Decree affirmed, and*
*cause remanded.*

(Decided 27th March, 1889.)