# CHARLES A. TULLER and Others v. LUCIAN SWIFT and Another.[1]

## January 20, 1911.

## Nos. 16,852, 16,853—(130, 131).

**Sale of stock in lump — right of minority stockholders to an accounting.**

H. owned the majority of the stock of a corporation. S. and M. were also owners of the stock. In 1901 H., S., and M. made a so-called tripartite agreement, by which each agreed not to dispose of any shares of the stock without first offering them in writing to the other two stockholders on the same terms offered by a third person. H. died, and in July, 1908, his executors executed an option contract, by which the tripartite agreement was annulled, and S. and M. secured an option to buy the shares belonging to the estate at the price of $300 per share, provided the option was exercised before September 1, and the sale was not made later than October 15, 1908. The sum of $150,000 was to be paid in cash and $570,000 in deferred payments as specified. August 21 four of the six plaintiffs assigned their shares of stock to S. and M. for $300 per share, to be paid on or before September 10, or, in default, the shares to be reassigned to their owners; and the other two plaintiffs gave S. a power of attorney to sell their stock. S. and M. executed a written contract with J. to sell and deliver the four thousand shares of stock in the corporation on or before August 31; the purchasers to pay one million dollars in cash, and the vendors to take all the cash assets and bills and accounts receivable on August 31, and pay all the indebtedness of the corporation accrued on that day, and hold the purchasers harmless by reason of any lawsuits pending or accruing on or before that day. This contract was performed, the executors delivered their twenty-four hundred shares of stock direct to J., and received the sum of $720,000 therefor, upon a prior understanding with S. and M. that the sum of $45,000 should be returned to S. and M. in consideration of the executors being paid all in cash, and also the $100 consideration paid for the option contract. Later H. paid S. and M. $45,100.

The six plaintiffs, who were either owners of stock or had the right to purchase certain shares, were paid at the rate of $300 per share, and in February, 1909, brought this action against S. and M. to set aside the assignment of stock and the power of attorney mentioned above, so far as those instruments may be claimed to give S. and M. any interest as pur-

[1]Reported in 129 N. W. 572, 130 N. W. 848.

chasers of the stock described, and for an accounting of the $45,000 received by the defendants and of the amount collected out of the corporation assets taken by the defendants. *Held:*.

1. The evidence sustained the finding that the defendants were acting in a fiduciary capacity, that they secured the $45,000 without the knowledge of plaintiffs and appropriated that amount to their own use, and that they must account for it to plaintiffs.

2. The evidence and the facts found overcame any presumption that the H. stock was to be equally divided between plaintiffs and defendants, and warranted the court in making the inference that it was understood that the stock, when obtained, should be divided pro rata, according to their prior holdings of stock, by plaintiffs and defendants.

3. The trial court erred in allowing the plaintiffs to share in the assets.

Action in the district court for Hennepin county by Charles A. Tuller, Winthrop B. Chamberlain, William A. Frisbie, William H. Webster, William McK. Barbour and George B. Bickelhaupt against Lucian Swift and John S. McLain. The complaint set out the facts stated in the first four paragraphs of the opinion, and further alleged that plaintiffs and defendants agreed to negotiate jointly with the executors of E. B. Haskell for the purchase of his shares of stock in the Journal Printing Company, jointly if possible; that defendant McLain represented to the executors that he was acting for the plaintiffs and the defendants, which representations the executors believed, and in reliance upon them the executors entered into the option mentioned in the second paragraph of the opinion; that after the execution of such option defendants assured plaintiffs that they would hold the option and assert all rights under it for the joint benefit of plaintiffs and defendants; that on or about August 6, 1908, defendants conspired together to appropriate to themselves all profits that might be realized on the Haskell shares by virtue of such contract, and deprive the plaintiffs of any share therein, also to appropriate to themselves to the exclusion of the other stockholders all profits that might be realized by a sale of all the stock and the termination of the company's contracts with plaintiffs Barbour and Bickelhaupt, and for the purpose of carrying such conspiracy into effect secretly negotiated the sale of all the stock to the Messrs. Jones, accepted in writing the offer made in the contract with the executors,

and obtained from the four plaintiffs the assignment of their stock mentioned in the second paragraph of the opinion, and from the other two plaintiffs the power of attorney to sell their stock mentioned in the third paragraph of the opinion. It alleged that the four plaintiffs received payment for their shares of stock in ignorance of the fact that defendants had sold the Haskell stock at a profit of $45,000, and alleged that the power of attorney and assignment of their stock was obtained from plaintiffs for the purpose of concealing from them the amount realized from the sale of all the stock and the profits on the Haskell shares. The complaint prayed for the cancellation of the contract of the four plaintiffs to convey and assign their stock to defendants for $300 a share, for the cancellation of the power of attorney so far as it gave defendant Swift any right save that of representing plaintiffs Barbour and Bickelhaupt in a sale of their stock, and for an accounting of defendants' profits on the sale of the stock not belonging to them personally, such accounting to include their profit of $45,000, and for a determination of the amounts to which plaintiffs were entitled respectively, and for judgment for such amounts.

The answer, in addition to what is stated in the opinion on page 271, infra, set out the substance of the so-called "tripartite agreement" of 1901, and alleged that after the death of E. B. Haskell, his executors opened negotiations with defendants to give them an option for the purchase of stock in lieu of, and as a substitute for, that agreement, and would give no option unless upon condition that such earlier agreement was cancelled; that plaintiffs were not parties to that agreement or interested in the negotiations, and were not parties to or interested in the option contract; it set out verbatim the written contract of sale to the Messrs. Jones, under which defendants were to receive certain assets of the Journal Company and were to pay all indebtedness of the company existing on August 31, 1908, and undertook to indemnify the purchasers on account of any pending law suits and claims against it. The answer alleged that the net amount to be realized from said assets fell considerably short of the amount sufficient to pay plaintiffs $300 per share for their stock, and in view of the deficiency defendants negotiated with the Haskell

executors for the purchase of the Haskell stock for cash at a less price than that named in the option, and the executors agreed to accept $675,000 in cash, but required defendants first to accept the option, and as a reason stated that they had given an option on the property contingent on defendant's failure to accept the option mentioned in the complaint; that defendants accepted the option and made an offer to the executors to pay $675,000 cash for the Haskell stock, which offer was accepted by the executors. The answer further alleged that at a meeting of the board of directors of the company on August 27, 1908, at which defendants and plaintiffs Tuller and Chamberlain were present as members of the board, the company by the board of directors, with the plaintiffs' consent, authorized the execution by the Journal Company of the proposed instruments to carry out the terms and conditions of the contract with the Messrs. Jones, and in pursuance of such authority the company by an instrument of assignment on August 31, 1908, attested by plaintiff Tuller as secretary, duly assigned to defendants all the assets mentioned in the contract, and by an instrument, attested by the same plaintiff as secretary and by plaintiff Chamberlain, undertook to carry out the agreement contained in the contract with the Messrs. Jones; that, after the execution of the contract with the Messrs. Jones, defendants notified plaintiffs of the execution thereof and of the terms thereof; that thereupon plaintiffs executed and delivered to defendants the contract for the sale of their stock and the power of attorney.

The reply alleged that on August 27, 1908, defendants had prepared a draft of the proposed minutes of a meeting of the board of directors of the Journal Company, and a draft of the proposed bill of sale from the company to the defendants, and a draft of a proposed contract between the printing company and the defendants, and defendants then requested said Tuller to attest said proposed bill of sale and said proposed contract, and requested Tuller and Chamberlain to attest by their initials said proposed contract, and relying on the representations of defendants and having no knowledge of the proposed sale, except as alleged, Tuller attested the bill of sale and the contract as secretary of the company, and Tuller and Chamberlain attested by their initials the proposed contract.

The case was tried before John Day Smith, J., who found the facts substantially as stated in the first four paragraphs of the opinion and in the allegations of the complaint mentioned above; and also found that the sale and transfer to the Messrs. Jones were made in the absence of the plaintiffs except Tuller; and to conceal from him as well as from the other plaintiffs that they were receiving profits on the Haskell stock, defendants paid to the executors $720,000, pursuant to an agreement that the executors should refund $45,000 of the money so paid over, together with the $100 on account of the cash payment made to the executors at the time of the execution of the option contract, and thereby make the real price of the Haskell stock $675,000; that defendants concealed from plaintiffs, except Tuller, their negotiations with the executors for the reduction of the contract price, concealed from the plaintiffs that any reduction was obtained, and concealed from the plaintiffs the arrangement to have the $45,100 refunded; that plaintiffs except Tuller had no knowledge that the executors were to refund, or had refunded said sum, until about November 1, 1908. As conclusions of law the court found that plaintiffs acquired a joint interest with defendants under the option, and the rights in the Haskell shares under it were held by defendants in trust for the joint benefit of plaintiffs and defendants; that the respective shares of plaintiffs and defendants in the twenty-four hundred shares and in any profits on them, were as follows: Defendant Swift $\frac{1}{2}$; defendant McLain 3/16; plaintiff Tuller 1/16, and each of the other plaintiffs 1/20; that as between plaintiffs and defendants the sale of the stock to the Messrs. Jones was voidable at the election of the plaintiffs; that the Messrs. Jones were innocent purchasers and their title was not attacked in this action; that as between plaintiffs and defendants plaintiffs were entitled to have the sale, and all documents procured by the defendants from the plaintiffs to effect the sale, adjudged null and void; that the plaintiffs were entitled to an accounting from the defendants for all money and property received as consideration for the sale to the Messrs. Jones; and ordered judgment against defendants for the sum of $12,953.75; that a receiver should be appointed, who was named in the findings, and that he should pay to the defendants and

the plaintiffs in the proportions named above the amount which might be realized by him from all the assets of the Journal Printing Company received by defendants upon the sale to the Messrs. Jones.

Defendants appealed from the order denying their motion for a new trial. Plaintiffs appealed from an order denying their motion to amend the findings of fact and conclusions of law, and from a subsequent order denying their motion for a new trial. Modified.

*Lind, Ueland & Jerome,* for plaintiffs.
*Cohen, Atwater & Shaw,* for defendants.

LEWIS, J.

The Journal Printing Company is a corporation, and owned, printed, and published the Minneapolis Journal, at the city of Minneapolis, for more than twenty-five years. The capital stock was $200,000, divided into four thousand shares of $50 each; and twenty-four hundred shares were owned by E. B. Haskell, of Boston, Massachusetts, until the time of his death, which occurred in 1907. Until August 31, 1908, defendant Swift owned eight hundred shares and defendant McLain three hundred shares. Plaintiff Tuller owned one hundred shares, and plaintiffs Chamberlain, Frisbie, and Webster owned eighty shares each. The remaining one hundred sixty shares were held in trust by defendant Swift, eighty shares for the printing company and plaintiff Barbour, and eighty shares for the company and plaintiff Bickelhaupt, under certain contracts of purchase by them. All of the parties had been employed by the company for many years—defendant Swift as general manager, defendant McLain as editor, plaintiff Chamberlain as managing editor, Frisbie as city editor, and Tuller as business manager. Barbour was manager of the advertising department, Bickelhaupt manager of the circulation and subscription department, and Webster manager of the mechanical department. The company's business prospered, and on August 31, 1908, the value of the stock was $300 per share.

July 29, 1908, defendants Swift and McLain secured an option for the purchase of the twenty-four hundred shares owned by the executors of the Haskell estate at $300 per share, $150,000 to be paid in cash on or before October 15, 1908, and $570,000 in deferred

payments, payable annually from 1910 to 1926, with interest at five per cent., to be secured by the deposit of twenty-four hundred shares of stock, with a provision for the release of a certain percentage of stock upon the payment of stipulated amounts. There was also a provision in the option .contract that the executors would accept in payment five per cent. bonds for the face value of the deferred payments outstanding, secured by a first mortgage upon all of the property of the Journal Printing Company. August 21, 1908, plaintiffs Frisbie, Chamberlain, Webster, and Tuller assigned all of their stock to the defendants, upon the condition that the defendants pay them $300 per share for the same on or before September 10, 1908, and in case the purchase was made the defendants were authorized to pay the executors of the Haskell estate any amounts that might remain due on the stock.

August 22, 1908, defendants Swift and McLain entered into a contract with Herschel V. and William S. Jones, whereby defendants agreed to cause to be sold and transferred to Messrs. Jones all the capital stock of the Journal Printing Company, including the Associated Press membership standing in the name of Mr. Swift, to be delivered at such place in the city of Chicago as the purchasers should designate on or before August 31, 1908. The purchasers agreed, as part consideration, to pay the sum of one million dollars in cash, $10,000 of which was paid at the time of the execution of the contract, and the remainder to be paid on or before August 31, 1908, upon delivery of the stock. The contract also contained provisions whereby the vendors reserved the assets of the company, with certain exceptions, including cash on hand and bills receivable, and assumed the obligations. The vendors also agreed to indemnify the purchasers from and on account of any pending lawsuits or claims against the company which might be made prior to the date of delivery. August 27, 1908, plaintiffs Barbour and Bickelhaupt executed a power of attorney whereby they authorized and empowered defendant·Swift to sell the shares of stock which he held in trust for them to such .person or persons and upon such terms as to him should seem meet, and authorized him to assign and deliver to the purchaser the

certificates of stock, ratifying and confirming each and every act of Mr. Swift in regard to such sale and transfer.

On August 27, 1908, a meeting of the board of directors of the company was held, and the directors authorized the execution of the proper instruments to carry into effect the terms and conditions of the contract with Messrs. Jones. On August 31, 1908, at the city of Chicago, the defendants transferred and delivered to Herschel V. and William S. Jones all of the stock of the Journal Company, the defendants reserving the assets and cash on hand, and Messrs. Jones paid to the defendants the sum of one million dollars in cash, except the sum of $10,000, which had already been paid. In making the transfer of the stock, defendants procured the executors to transfer and deliver direct to the Joneses the twenty-four hundred shares of stock referred to in the option contract. At the time of the transfer of the Haskell stock, the executors were paid the sum of $720,000 in cash; but such amount was paid with the understanding between defendants and the executors that the sum of $45,000, together with $100, which had been paid as the consideration of the option contract, should be repaid as a consideration for receiving all cash. In pursuance of such arrangement the sum of $45,100 was refunded and paid to the defendants by such executors on September 10, 1908. From the balance of the money received from Messrs. Jones, defendants paid, on September 2, 1908, to plaintiffs Tuller, Chamberlain, Frisbie, and Webster at the rate of $300 per share for the stock owned by each of them, and to the plaintiffs Barbour and Bickelhaupt the amounts which they were to receive under their contracts above referred to. Defendants took possession of the cash on hand and other assets, which had been reserved by them, and proceeded to collect the accounts.

This action was commenced February 28, 1909, for the purpose of setting aside the assignment which had been executed by plaintiffs Tuller, Chamberlain, Frisbie, and Webster to defendants Swift and McLain, and the power of attorney which had been executed by plaintiffs Barbour and Bickelhaupt, authorizing defendant Swift to sell and transfer their stock, and for an accounting of the $45,100 received as a discount from the Haskell executors, and of the amount

received and collected by defendants out of the assets reserved. The theory of the complaint is that defendants were representing, not only themselves, but all of the plaintiffs, in negotiating for and securing the option contract from the executors of the Haskell estate, and the $45,000 should be distributed per capita among the six plaintiffs and the two defendants; that is to say, an undivided one-eighth to each. Plaintiffs also claim that it was their understanding that the purchase price at which the entire capital stock was to be sold to the Joneses was $300 a share for four thousand shares, amounting to $1,200,000; that without their knowledge or acquiescence the defendants made a contract with Messrs. Jones whereby they received only $1,000,000 in cash, and the assets in lieu of $200,000 in cash; that, having profited by this deal, plaintiffs are entitled to an accounting for the amount so received.

The answer denied that plaintiffs had any interest in the Haskell stock, and alleged that the $45,100 refunded was obtained from the executors of the Haskell estate in consideration of paying cash for the stock, instead of deferred payments, as provided by the option contract. And the answer denied that plaintiffs had any interest in the assets which had been reserved by the defendants; that the Joneses could raise only one million dollars in cash, and in order to make a sale it was necessary for the defendants to assume the obligations against the company, and to reserve the assets specified, and to assume certain obligations, and that plaintiffs had accepted the amount paid to them in full settlement, according to agreement.

1. The trial court found that the option contract with the executors was procured by the defendants with the understanding that it would be held for the joint benefit and use of all the plaintiffs and defendants. Defendants insist that this finding is not sustained by the evidence, and refer to a previous contract, known as the "tripartite agreement," and insist that the option contract was executed in consideration of its cancellation.

The tripartite agreement was executed in October, 1901, by the defendants and E. B. Haskell, and was to the effect that neither one of the parties to the agreement would dispose of any of his shares of stock in the company then or thereafter owned by him without first

offering such shares in writing to the other two stockholders on the
same terms as offered him in good faith by any other person.    The
Haskell executors recognized this agreement as binding upon them,
and insisted upon its cancellation as a consideration for the option
contract.    This tripartite agreement was undoubtedly of value to
the defendants, because it gave them the opportunity of preventing
the transfer of the majority of the stock to an outside party.    It is
true that the plaintiffs had no interest in this tripartite agreement,
and defendants may have been in a position to deal independently
for the stock without reference to the plaintiffs.    But we are satis-
fied that, from the beginning of the negotiations with the executors
until they culminated in the execution of the contract, it was the in-
tention of the defendants to waive whatever rights they possessed
under the tripartite agreement, and to secure control of the Haskell
stock for the benefit of all the minority stockholders.    It is not neces-
sary to refer fully to the evidence bearing upon this point.

It appears from the correspondence and from the negotiations with
the executors with reference to an option which had been given to a
third party which affected the interest of all of the Minneapolis stock-
holders.    It appears from the conduct of the parties in several meet-
ings, where the question of mutual protection was discussed.    It
appears from the methods discussed for payment by utilizing the cash
of the company on hand and by the execution of company notes.    In
their effort to impress upon the Haskell executors the advisability of
dealing with the stockholders, rather than with a third person, de-
fendants emphasized the fact that the good will of the Journal was
owing largely to the personality of the Western stockholders, most
all of whom had been with the Journal during the entire twenty-three
years of the present management.    It was testified to by the attorney
representing the executors, as well as by one of the executors, that
such was their understanding, and that the option contract was taken
in the name of the defendants for the sake of convenience and sim-
plicity.

The plaintiffs certainly understood that the option was being se-
cured for their benefit, as well as for the benefit of the defendants,
and were not called upon to inquire into the nature of the instru-

ment, to see whether they were expressly protected. Indeed, the defendants did not seriously contend otherwise at the trial. Their position was that the option was taken with the understanding that the stock would be purchased for the purpose of continuing the business, but that Mr. Swift afterwards determined to sell his stock and retire, and the other stockholders, including Mr. McLain, were given an opportunity to purchase his shares, as well as the Haskell stock; that they were unable to finance the deal, and that it was then determined to sell the entire capital stock to Messrs. Jones, and in order to accomplish a sale it became necessary to secure a concession from the executors, and that the cash purchase at a discount was the result. Defendants claimed that this amounted to a new deal between them alone and the executors, and that plaintiffs received the $300 per share as contemplated, and have no interest in the money saved by the refund.

Defendants may have been sincere in believing they had a right to the refund, but their relation to the other stockholders was fixed by the option. As stated above, the right to purchase the Haskell stock inured to the benefit of the plaintiffs, although not named as purchasers. The purchase of the stock was pursuant to the option. By virtue of its provisions defendants had been able to prevent the executors from dealing with other parties, and it tied up the stock until October 15, 1908. The only change made was in the terms of payment, and, if defendants secured an advantage by paying cash, that advantage inured to the benefit of the parties they represented. The evidence sustains the trial court in finding that the defendants secured $45,100 without the knowledge of the plaintiffs and appropriated the refund to their own use; that they were acting in a fiduciary capacity and were accountable for the money so received.

2. Plaintiffs' appeal involves the question of the division of the refund and the allowance of certain attorney fees. The eighth finding of the trial court is as follows:

"In the aforesaid venture for the acquisition of the said twenty-four hundred shares the plaintiffs and defendants intended and agreed that if said stock were purchased they would pay for it by using the Journal Company's available funds, about $120,000, and

113 M.—18.

by issuing bonds of that company secured by mortgage on its plant and property for the deferred payments, which they expected would amount to more than $500,000, and by using the future earnings of the Journal Company to meet such deferred payments. It was further their intention and agreement that the twenty-four hundred shares, if purchased, should not be canceled or be held as treasury stock, but that they should be owned by plaintiffs and defendants pro rata according to their then holdings of the Journal Company's stock. There was, however, no express agreement between the parties as to the part that each should have of said twenty-four hundred shares. Their agreement in this respect is inferred from the facts and circumstances in evidence."

This finding is of evidentiary facts, with the conclusion of law that it is to be inferred from the facts that the parties intended that the stock was to be divided pro rata. There was no question but that the facts are as stated in the findings. It was not the intention of the parties to cancel the stock, or to hold it in the treasury, and there was no express agreement as to how it should be divided; but it was thoroughly understood among all the parties that, in case the purchase was made the company's cash on hand, about $120,000, would be used for the purpose, and that the bonds of the company, secured by a mortgage on its plant, would be issued to meet the deferred payments.

Did the facts, as found, and the evidence, warrant the court in drawing the inference that it was understood the stock would be divided pro rata, according to the holdings of each stockholder?

The general rule is stated in 30 Cyc. 451, as follows: "The profits of a partnership are to be divided equally between the partners, however unequal may be their contributions of capital or of services, in the absence of an agreement express or implied to the contrary, or unless some fact or circumstance exists from which it may be inferred that the partners intended that the profits should be divided in unequal proportions." It is stated thus in 22 Am. & Eng. Enc. (2d Ed.) 101: "Where there is no proof of an agreement between the partners as to apportionment, the presumption will be that both profits and losses were to be divided equally. Such equality will be

presumed, notwithstanding the fact that the contributions to the firm capital have not been equal, and whether the partners are or are not on a par with regard to skill, connection, or character, or whether they have or have not labored equally for the benefit of the partnership.   *   *   *   The presumption may be rebutted by evidence of circumstances showing that the partners intended differently.   It is a question of intention, to be determined by a consideration of all the facts available for the construction of the contract."

The application of the rule is illustrated in the following cases: In Broadfoot v. Fraser, 73 Vt. 313, 50 Atl. 1054, the several partners had contributed different amounts to the partnership, but there was a total absence of any agreement for other than an equal division of the profits, and the rule was applied that upon a dissolution the presumption was that the profits were to be divided equally, and not in proportion to their respective contributions to the capital.   In Wetmore v. Crouch, 150 Mo. 671, 51 S. W. 738, one partner had contributed the money, and the other had performed the services with reference to the purchase of a piece of real estate.   A similar case is Frazer v. Linton, 183 Pa. St. 186, 38 Atl. 589, and also Rankin v. Black, 1 Head, 650.

However, the presumption that the profits are to be divided equally is not an irresistible one, but is a question of intention, to be determined by all the facts and circumstances.   The case of Fleischmann v. Gottschalk, 70 Md. 523, 17 Atl. 384, furnishes a fair example of the exception.   There the defendant was engaged in a large and lucrative business, and had agreed with A. to take him into partnership upon his marriage with his daughter.   Nothing was said about duty, service, contribution to capital, nor as to the share A. was to have in the profits.   In an action brought by A. to recover one-half of the profits, the court held that under the circumstances the presumption of equal division was overcome, and that his proportion of the profits was left to the judgment of the merchant.

Turning our attention now to the evidence in the case before us, a most important factor is that it was contemplated by all the parties to utilize the cash on hand, and to secure the deferred payments by notes or bonds and mortgage of the company.   Up to the time that

the option was executed, July 29, the subject of the division was mentioned in a general way, but always with a view to retaining the Haskell stock, if purchased, and to continue the business; but no definite arrangement was reached, and finally Mr. Swift announced that he wished to retire. It then became necessary for the other stockholders to purchase the interest of Mr. Swift, or, failing in that, to sell out the business and transfer the entire capital stock to a third party. Not being able to purchase the Swift stock and continue the business, the sale was made to Messrs. Jones at a profit of $45,000.

Another important factor is the influence of defendants by reason of their position and large holdings. Mr. Swift was the general manager, and owned eight hundred shares. He took the initiative to secure an option for the purchase of the Haskell stock, when he discovered that there was danger of the stock passing into other hands. The negotiations were conducted entirely by the defendants. They canceled the tripartite agreement and secured a reasonable price for all the stockholders by reason of their personal efforts and influence. Although a proposition was made to them for a division of the Haskell stock per capita at about the time the option was secured, it was rejected upon the ground that it was not a fair division; but in the event of continuing the business Mr. Swift suggested that each of the stockholders take a number of shares equal to the number owned by each, and that the balance be divided equally. This proposition, however, was not accepted.

The rule that the profits of a partnership are divided equally among the partners is based largely upon the fact that it is impossible, in the absence of express agreement, for a court to fix a proportionate value on the services of the respective partners. Had the plaintiffs and defendants not been stockholders, then the general rule might apply. But the interest of these parties as stockholders, their evident purpose to have the stockholders become finally responsible, according to the amount of stock held, for the deferred payments, and the whole course of conduct, leads to the conclusion that the presumption of equal division was overcome, and that the facts warranted the trial court in concluding that it was the intention to divide the stock or the profits pro rata, according to the amount of stock held by each.

We find no error in the allowance of attorney fees.

3. But we are unable to agree with the learned trial court that the plaintiffs were entitled to participate in the assets as well as in the refund. After the negotiations with the executors had terminated successfully in the execution of the option contract, at the suggestion of plaintiffs, Frisbie and McLain were given a ten days' option by defendant Swift in which to purchase his eight hundred shares at the price of $300 per share, with the understanding that they might purchase the Haskell stock under the option already secured. The parties made some attempt to interest capital with a view of making such a purchase, thus enabling them to become the owners and to continue the business, but it resulted in accomplishing nothing. Mr. Swift then advised the plaintiffs that he had a party with whom he had been negotiating, and they were informed that the price would be $300 per share. The court found that this offer of Mr. Swift to sell his stock to the other stockholders was not made in good faith, and that the defendants fraudulently made the proposition for the purpose of inducing the plaintiffs to enter into the scheme for the sale of their stock at $300 per share.

While possibly Mr. Swift may have had good reason to believe that the other parties would not be able to purchase, the plaintiffs had the opportunity at least of doing so, had they been able. Probably the other stockholders were largely dependent on the co-operation and good faith of the plaintiffs in conducting such a deal; but we are unable to see that the charge of bad faith in this respect had any connection with the subsequent conduct of the defendants in accepting the assets for $200,000 cash. In the first place, the Joneses were unwilling to pay the entire purchase price of $1,200,000 in cash, and had suggested one million dollars, and that the vendors retain the assets. At the time Mr. Swift made the offer to the plaintiffs and to defendant McLain to sell them his stock, the contract with the Joneses had not been executed, and we discover nothing in the record to indicate that such offer was made for the purpose of inducing the plaintiffs to sell at $300 per share, or to cover up a secret deal for the assets to the advantage of defendants, or either of them. Defendants had no personal knowledge of the exact value of the assets;

except that there was about $100,000 in cash on hand. The value of the balance was somewhat speculative. Defendants assumed the obligation of guaranteeing the purchasers from lawsuits, and no doubt made this part of the deal a personal matter for the purpose of bringing the sale to a close.

That there was no intent to conceal anything from the plaintiffs with respect to the substitution of the assets appears from the conduct of the defendants themselves. Plaintiff Tuller was informed during the negotiations with Messrs. Jones that the subject of defendants assuming the assets in lieu of cash was under consideration, for he was called on by Swift to furnish an estimate of the value of the assets, and he estimated their value at something less than $200,000. He testified that he did not inform his associates, the other minority stockholders, that such negotiations were pending, and that he supposed he should treat the information obtained as confidential. But Mr. Swift made no request of that kind, and there was no proof that the Jones contract was kept from the knowledge of plaintiffs. When the directors met on August 27 for the purpose of authorizing the company to carry the contract into effect, plaintiffs Chamberlain and Tuller were present as directors, and were notified by the resolution and the minutes of the meeting, although previously prepared, that the substitution was to take place, and that the defendants were to take the assets as a part of the consideration of the purchase of their stock. On September 2, at the time plaintiffs received $300 per share for their stock, each of them, with the exception of Webster, knew that such arrangement had been made, that only one million dollars in cash was paid by Messrs. Jones, and that the defendants were to receive the assets in lieu of the other $200,000. They received the money without protest, with full knowledge of the facts, and they could not remain silent, even if prior to that time they had been led to believe that the entire purchase price was paid in cash, or that the defendants were acting in the capacity of trustees in receiving the assets. They would not be permitted to receive their full proportion of the full cash price, and wait to see whether there would be any profits in the transaction, before repudiating it.

But we do not base our conclusion upon this ground alone. From

a reading of the record we are satisfied that the substitution of the assets for cash in the purchase of the defendants' stock was made in good faith, for the purpose of completing the deal and satisfying the demand of Messrs. Jones, and to enable defendants to complete the transaction without putting up the extra $200,000 in cash, and not for the purpose of acquiring additional advantage to themselves.

The conclusion we have reached leads to affirmance in so far as the plaintiffs are entitled to participate pro rata in the $45,100, and to affirmance on plaintiffs' appeal, but to a reversal of that part of the order which orders judgment that the plaintiffs are entitled to participate in the assets.

So ordered.

JAGGARD and SIMPSON, JJ., took no part.

On March 24, 1911, the following opinion was filed:

LEWIS, J.

A reargument was granted on the question whether the $10,000 left over from the proceeds of the Barbour and Bickelhaupt shares belonged to the several stockholders or was a part of the assets taken over by defendants.

In 1906 the Journal Printing Company had become the owner of one hundred sixty shares of the company stock, and on the seventh day of September, 1906, entered into a contract with plaintiff Barbour by which it sold to him eighty shares of the stock at $150 per share, or $12,000, to be paid for on or before October 1, 1910, with interest at six per cent., dividends to be applied in payment. Among other things, the contract provided that, if at any time within five years "the stockholders shall sell all the company's stock in a lump or bulk sale, the employee, in lieu of all rights of every kind under this contract, shall be entitled to participate in such distribution and in the proceeds of such sale to the following extent, and no more: If the sum realized from such distribution or from such sale shall exceed one hundred fifty dollars ($150) per share, the employee shall be entitled to receive one-sixtieth (1/60) of such excess for each month

during which this contract shall, at the time of such distribution or sale, have been in force, beginning with October, 1905, and the employee hereby waives all right to object to such distribution or sale, and hereby consents thereto." A similar contract for the sale of eighty shares was entered into with plaintiff Bickelhaupt, of date October 11, 1906. On November 28, 1906, the board of directors of the company by resolution caused these one hundred sixty shares of stock to be issued to defendant Swift as trustee, in trust to receive and apply the dividends in payment of the stock in accordance with the terms of the contracts. The stock was issued accordingly, and · accounts were opened by Swift as trustee, and the purchasers were each charged with the purchase price, $12,000, and interest, and were credited with the dividends and cash applied in payment. On the eighth day of July, 1908, the last dividend was credited, and the account then showed that Barbour still owed $8,588.86 on his stock, and Bickelhaupt $9,419.14 on his. On the thirty-first of August, 1908, the four thousand shares, constituting the entire capital stock, were transferred by defendants to Jones, and on the first of September Mr. Swift paid to the company on Barbour's contract $8,622.97, and paid Barbour $10,237.22; and he paid the company on Bickelhaupt's contract, $9,444.94, and to Bickelhaupt $9,555.06. He also paid $139.81, which Barbour owed the company. It was conceded that the contracts had run thirty-five months, and in making settlements with them Mr. Swift allowed each of them 35/60 of · $12,000, as provided by the contracts. The one hundred sixty shares were sold for $48,000, and the total amount paid by Mr. Swift on their account was $38,000.

Who was entitled to this $10,000 surplus? The contract provided that, if the employees should fail to remain in the employ of the company for five years from October 1, 1905, the contract should become void, and, further, that if within said five years the assets should be distributed to the stockholders, or all of the stock should be sold in a lump or bulk sale, then their interest in the excess over the cost to them was limited as above stated. Their stock had not been paid for in full, and only thirty-five of the sixty months had transpired. The sale of the entire capital stock to Jones was a lump

or bulk sale within the meaning of the contract, and hence Barbour and Bickelhaupt were limited to 35/60 of the $12,000 excess.

Jones makes no claim upon this $10,000, and the question of ownership is between the defendants and the plaintiffs. Defendants claim it as a part of the assets taken over by them in lieu of the $200,000 cash. Plaintiffs deny that this money was a part of the company assets, and insist that, according to the terms of the contract between Barbour and Bickelhaupt, the surplus, if any, upon a bulk sale, was reserved to the stockholders. At the time that contract was entered into the one hundred sixty shares were the property of the company. The plan seemed to be to make it an inducement to the employees to remain in the employ of the company. If they had defaulted in the payments, or had quit the service of the company within five years, the contract would have become void, and the company would have remained owner of the shares. Mr. Swift held them in trust only, subject to the conditions of the contract. If the shares had reverted to the company for noncompliance with the contracts, and had been sold and transferred to Jones with the other assets, the proceeds would have been a part of the assets of the company. Since this surplus belonged to the company, it passed to the defendants as part of the assets, unless something in the contract expressed a contrary intention. We find nothing to that effect. Barbour and Bickelhaupt construed their contracts by accepting 35/60 of the surplus, and no suggestion was made by any one that the money did not belong to the company. Mr. Tuller took it into account as a part of the assets of the company when he made the estimates upon which the deal with Jones was completed.

As determined in the previous decision, defendants were entitled to retain all the cash on hand August 31, 1908, and we now hold that the $10,000 surplus passed to the defendants with the other assets of the company.

SIMPSON, J., took no part.